' Johnson, J.
We first meet the question as to how distribution shall be made among the remaindermen.
The will provides that on the death of the son “without living issue, then * * * it is my will, that all my estate shall go, one-half to my lawful heirs, and one-half to the lawful heirs of my wife, subject to the following conditions,” etc.
It is insisted that the “lawful heirs” are to be ascertained on the happening of the contingency upon which the distribution was to take place; that is to say, upon the death of Harry E. Chapman, the son and life tenant. This is the contention of the children of William H. Chapman. The other heirs of the testator contend that the persons entitled to take are to be ascertained as of the date of the testator’s death. It is of course conceded by all that the intention of the testator must prevail, and that it must be found in the language of the will itself where that is possible.
Counsel opposing the judgment of the circuit court have cited many Ohio cases in support of their contention, and particularly insist that the case of Barr v. Denney, 79 Ohio St., 358, is decisive of the matter. In that case the testator devised and *36 bequeathed the whole of his estate, real and personal, to his wife during her natural life, except certain amounts to equalize gifts among his children. And then without any express or implied legacy, except as is contained in his direction to the executor to convert his personalty and distribute, made the following dispositive clause: “After the' death of my wife I desire that the whole of my property, both real and personal, be sold by my executor and after expenses are paid to distribute equally to my legal heirs.” It was held that “the rule that a bequest in the form of a direction to pay, or to pay and divide at a future period vests immediately, if the payment be postponed for the convenience of the fund or estate, or merely to let in some other interest, docs not apply. Linton v. Laycock, 33 Ohio St., 128, distinguished. Richey, Exr., v. Johnson, 30 Ohio St., 288; Sinton v. Boyd, 19 Ohio St., 30, and Hamilton v. Rodgers, 38 Ohio St., 242, approved and followed.” The third paragraph of the syllabus is: “In such casé the direction to the executor to pay or to distribute to the testator’s ‘legal heirs’ confers a contingent interest, which does not vest until the period of distribution;' and the direction ‘to distribute equally to my legal heirs’ is equivalent to a direction to make distribution in accordance with the statutes providing for descent and distribution.”
Barr, the testator, had children, but it will be observed that he made no devise of the remainder to the children by name or as a class. The court say at page 367: “He makes no gift over, either by remainder or executory devise; but looking to *37 the future, he says, ‘After the death of my wife'I desire that the whole of my property, both real and personal, be sold by my executor and after expenses are paid to distribute equally to my legal heirs.' There is nothing further in the will to explain or qualify this clause.” At page 368,. the court sayi “Hence the most natural interpretation'of this will is that the testator bequeathed nothing after the expiration of the life estate and contented himself with the expression of his desire that the property should all be converted into personalty and then distributed, equally among those who might then be his lawful heirs.”
The contention that the rule above announced by this court is of controlling force on the question we have here, would be persuasive if Mr. Chapman had1 not indicated, by the language he used in the same' item, the class which he intended to be included in the designation “lawful heirs.” The provision is “If my said son shall die, without living issue, then, after his death, if he survive his mother * * * it is my will, that all of my estate shall go, one-half to my lawful heirs, and one-half to the lawful heirs of my wife.” It is apparent that the term “lawful heirs” is not used in a strictly technical sense, because in such a sense it would include only his widow and son, and yet these are excluded from the class “lawful heirs” to whom the estate shall go on the happening of the contingency—the death of the son without issue. In Jones v. Lloyd, 33 Ohio St., 572, it was held that where a testator had made provision for hi* wife and that in the event of her claiming dower the balance of certain personal *38 property should be shared equally among “my heirs'/’''the word “heirs” would be construed as meaning next of kin to the exclusion of the wife, although in case of his intestacy she would have taken it all. ' The will of Mr.' Chapman then contains the following significant provision: “That if imy- sister, Mary E. Buckland should survive mb', then it is my will, that, the share that she would rer beive' ai .law, should remain in trust, in the hands of my said trustees, she to receive the income there-r frdm.¡-during her lifetime, and at her death,'. said sháreíto .'bé paid to and vest in her. daughter and the heirs of her daughter, Maria. It is my will, that no. part of my estate shall ever go to my said .sister’s son,.-.George. And provided, fifrther, that the share that would go. to .Mary A. Solloway, sister of my wife, shall remain in trust during the lifetime of said- Ma'ry. A. Solloway; she, during said time to receive' the net .income from said share,' and at her death,. it¡ is: my'-.will, -that, said' share, should go to the'-' other -heirs of. my said wife,' -excluding 'therefrom, the .children of the said Mary A. Solloway,- it being my will: that. the said children Of the said Mary A.. Solloway shall inherit or-receive no part of¡imy estate. And. provided,- further, that the part' of-my estate which, would go to Mitchell H. ,'Miilér, brother, pf 'hiy wife,, .shall be held in trust-.during the remainder of his lifetime, by said trustees,'he to • receive.: the.'net ¡income therefrom, and at his decease, the samé to go to his children.” Taking these provisions together, it is clear that the testator has, by-his own language,' indicated :the meaning which he¡ intended .the.words, “lawful heirs”.should have. *39 He specifically refers tó his sister and the. sister of his.wife as being among those who áre entitled- to a share, and makes specific provision as to the; control, custody and final disposition - of those shares. As-conclusive of the fact that he did not intend the words “heirs at law” as used by-him- in his;i Will to have the same significance as the term “lawful heirs” used in Barr v. Denney, supra, he' did-flot leave the shares of the ladies referred 'to, tó gó: according to the statutes of descent and distribution, but specifically provided hów they should go/' The controlling clause of-the item is itself'-'dispositive, “that all of my estate' shall go,” etc.' ■ The terfii “heirs at law,” as -found in -this will,, must Té'-construed in connection with the other language and provisions touching the sáme subject-matter.' The flexible meaning generally- ascribed to the term- and the impossibility: of giving it a rigid -application Tó every context is well illustrated here.' It'cannot be'said here as the-cóúrt said in Barr v. Denney, supra, “There is nothing further in the" will'to fix-plain or qualify this clause.”
The testator-intended that the “lawful heirk” to whom “all of my estate shall go” wefe hi's brothers and sisters and th.e brothers and sisters of his wife and their representatives who were living át his or her death respectively. We, therefore,-hold that these shall take'as remaindermen per stirpes, the representatives of deceased brothers and sisters Té táke the share that would have gone - to their de1 ceased ancestor, except in the instances in which the third item itself provides that such shares shall . go or” not go to certain specified persons. i :'
*40 The most interesting and important phase of the controversy, is involved in the last question made by the pleadings. The Latrobe Steel Works was a Pennsylvania corporation organized in 1888 with a paid-up capital of $600,000. It, and the successor .company into which it was later merged, shared in the remarkable success which has attended the steel industries of the country.
The testator, Mr. Chapman, at his death in January, 1893, owned and held 250 shares, par value $25,000, of the stock. His entire estate, including this stock, was valued when turned over to the trustees at $110,648.63. In September prior to his death the corporation had a surplus of $187,387.16.
In the fall of 1895, by the consent of all of the stockholders, this company sold all of its assets, including its plant, to a new company, which was named The Latrobe Steel Company, for $1,200,000 of its capital stock. The stockholders of the old company received two shares in the hew company for each share held by them. The trustees received $50,000 stock in the new company and gave up the $25,000 held by them in the old company. At this time the old company had, as shown by its books, a surplus of $868,022.18. This was invested in real estate, machinery, tools and other assets, there being. in cash only $6,831.19.
. ■; By a reduction of some of the assets this surplus ,was reduced to $600,000, and this, with the original capital, made up the $1,200,000 turned over to the new company for its stock.
The authorized capital stock of the new company was $1,500,000. The extra $300,000 of stock was *41 subsequently sold for cash, which in 1898 was used to purchase the capital stock of The Latrobe Steel, & Coupler Company, a Chicago company engaged in the same business. As stated, the business was prosperous, and for a period of about ten years dividends were paid, which for a number of years were ten per cent, semi-annually. These dividends were paid as received by the trustees to Mrs. Chapman, the widow. . ,.
In the fall of 1905 the company sold its entire plant at Latrobe for $4,300,000 cash. This sale did not include book accounts, the raw and manufactured material on hand, the cash nor the holdings in the coupler works.
The assets thus sold had a book value, as shown by a statement offered in evidence, of $1,039,944.55, There was, therefore, a bonus or profit in this sale of about $3,260,000.
The company determined-to go out of business and was thereafter principally engaged in the process of liquidation. The Chicago concern was subsequently sold and all of the assets converted into money, leaving for distribution, after payment of debts, the sum of $8,549,250. As the trustees held $50,000, or one-thirtieth, of the stock, they received that proportion of the above sum, viz., $284,975,
When the final distribution was made there was a large sum on hand in cash, in an account carried as contingent capital.
It is referred to in the testimony as a war fund and was created by the company to meet the emergencies of price cutting or warfare on the part of competitors,
*42 The president of the company testified as to its creation and condition from time to time. ’He.says: “When we started our works our competitors cut th¿ price to prevent us from getting ahead. I cut it in'two to the bottom of the ladder first, and I kept it;'there for three years. One company was busted, anbther'was $890,000 in .debt, the.other company went out' of general outside business, and we worked all the time.”
' The evidence fairly shows that this fund was created and built up from time to time and used-to fortify the credit and aggressive ability of the company;tb extend its' business and effectively contribute to its strength and progress. It was as much part of the cápital of the company as the plant, the machinery, the good will or any other element which assisted in the success attained.
No one would contend that it is not in the power óf a'córpóration to create a fund with which to be sure of sufficient working.capital at all-times and to5 safeguard its operations'against emergencies of every ' kind, including competition or general - depression in1 the business world. In truth, it may be S'áid no bne! would deny that it is the duty of those Controlling such an enterprise to do these things when' able to do so.
; In'the absence of bad faith or an unreasonable éxe’r'éise' -bf this" discretion. by a company, courts ought not to and would not intervene to control or change the course adopted. An arbitrary disregard of’the rights of stockholders to dividends or other ■improper- treatment of the assets of the company , would be relieved against. It is not claimed that *43 any stockholder in this case complained, but all apt ■pear to have approvéd and éncouraged the course ■adopted. • t ...j
i We think the contingent fund is in this cabe, subí ■ject to the same-rule as the rest of, thefncreasie. of the company’s assets.. If the life annuitantsure. en* titled to it they are entitled to the rést of the, fund which they claim. .■■>:. ■ • ¡\
i'- The-.'trustees regarded and treated'the-¡sum ref ceived1 on distribution, $284,975, as part ; of. the corpus or capital of the trust estate. ,v Theybdid; not pay it Over to the life annuitant as. income;.; bufe held it for the remaindermen. ■ :!
■ The life annuitants while they .lived.;, made; no claim to the fund,, but affirmatively consented; that it should be held as part of thetrust estate. . ;.¡. ■ ' -0. i After the death of .the widow her estate' was set" tied and no claim was made on behalf, of her .estate
■ 'The son haying died without issue, the claim.¡i? now asserted on behalf of his adopted; son* that a large part of the 250 shares’ of additional stock and of the sura received in liquidation should be; ,treated as income belonging to the life tenants.. The.widow having died intestate,' if she was the Owner, of, any part- of the fund held by the trustees, it-of/course passed to her son and through him to his adopted ■son. , ;■ ... ",c ,;■
On-behalf of the.life tenants it is¿ contended that the domicile of the testator, at the time-, of. his, death .was in Pennsylvania and that the-question as:.tq the .distribution of the fund should, be.-determined,).by the laW of that state. Oh the other»hand;dtus-in!sistéd that, as a matter, of fact, the' domicile, of. the *44 testator at the time of his death was in Cuyahoga county, Ohio, and it is urged that as the will was probated in Cuyahoga county as an original probate, the judgment of the court admitting the will to probate in that county cannot be attacked in this proceeding. A direct issue was made between the parties on this question. Considerable evidence was offered by each side in support of its view, and the court of appeals found under the evidence in the case that the domicile of the testator at the time of his death was in the state of Ohio. This court will not inquire as to the correctness of the decision of the court below on the weight of the evidence. It is, however, insisted that sufficient undisputed facts were shown to establish the residence in Pennsylvania. Concerning this, it appears that Mr. Chapman between 1870 and 1882 resided much of the time in Cleveland. At the time of his death, in January, 1893, he had been for some years in Philadelphia. Much was shown in support of the claim that he was a resident there. When he died he was brought to Cleveland for burial. During the time that he was in Philadelphia he does not seem to have established any home there, but with the exception of some short absence in California he and his wife roomed at the home of a physician. It is not shown that he ever voted in Philadelphia. He and his wife made frequent visits to friends and relatives in Cleveland, and he frequently stated his purpose to return to Ohio when he had gathered sufficient estate to take care of himself and wife. His investments and bank accounts were under the control of H. C. Miller from time to time in Cleve *45 land. In May, 1891, while in Cleveland he made and executed the will in question in this case. It will be noted that in this instrument he describes himself as “Nathan E. Chapman of the city of Cleveland, county of Cuyahoga and state of Ohio,” and in the last clause of the will he provides that in case either of the trustees should refuse to accept the trust, or fail to act as such trustees, the probate court shall appoint a successor or successors, as provided for in Section 5986 of the Revised Statutes of Ohio. It is hard to avoid the impression that great weight should be given to this declaration and direction. It is true that such a recital or direction in a will or deed is, by the weight of authority, not regarded as conclusive on the question of domicile. But when there has been no change in the situation of the testator with reference to that matter between the time of the execution of the will and his death, such as to show that he really intended to establish his residence or habitation elsewhere, these declarations and provisions are evidence of high character and might well be held to establish the domicile in the absence of more convincing proof to the contrary. Ennis v. Smith, 14 How. (55 U. S.), 44; Ward v. Oxford, 8 Pick., 476.
After the death of the testator Mrs. Chapman made application in the probate court of Cuyahoga county for the probate of the will and stated therein that the testator was late of Cuyahoga county, Ohio. At the end of this application she states her .residence to be Cleveland, Ohio.
Section 10604, General Code, provides that upon the death of any inhabitant of this state letters tes? *46 tamentary shall be granted by the probate court of the county in which he was an inhabitant or resident at the time he died. One of the jurisdictional facts, therefore, which the court was required to pass on in the consideration of the application was whether the testator was an inhabitant of Ohio— Section 10520, General Code, provides for a contest of the jurisdiction of the probate court to entertain an application to probate, and Section 10521, General Code, for the review of the decision on error.
The probate courts of Ohio are vested with full' power to fully and finally adjudicate all questions arising in matters properly before them. They are courts of record in the fullest sense. They belong to the class whose records import absolute verity, that are competent to decide on their own jurisdiction, and to exercise it to final judgment, without setting forth the facts and evidence on which it is rendered. Shroyer, Gdn., v. Richmond, 16 Ohio St., 455; The C., S. & C. Rd. Co. v. Village of Belle Centre, 48 Ohio St., 273; Crawford, Admr., v. Ziegler, 84 Ohio St., 224.
It is insisted that the adjudication in this case" was not necessarily conclusive because provision is made in the Code for the admission to probate by ancillary proceedings of the wills of persons who” are not residents of Ohio. But this was not an' ancillary proceeding. This will was admitted to probate as that of . a deceased inhabitant of Ohio. The adjudication of the court on the application • made cannot be questioned in a collateral action by any person who invokes such jurisdiction or by *47 those claiming under such person. From these conclusions it follows that the distribution of the fund in the hands of the trustees must be in accordance with the rules of law declared or to be established m Ohio.
Whether the life tenant or the remaindermen shall be entitled to a stock dividend declared out of earnings accumulated during a term of years and used by a company in the improvement of its property and business, is a question that has not been determined by this court. Nor has the rule that shall be followed, as between the life tenant and remaindermen, in the distribution of the proceeds of the assets of a corporation on its final dissolution.
The question has been frequently before the courts of England and some of the states of this country. Three principal rules have been considered. They have been referred to as the English, the Pennsylvania and the Massachusetts rules, respectively. In the subsequent consideration of them in the jurisdictions where first declared, each of them has been modified or changed to a greater or lesser extent.
Under the English doctrine, as originally stated at a very early day, all ordinary dividends go to the life tenant and all unusual dividends that are payable in cash or in stock belong to the corpus of the fund and not to annuitant. This rule which was followed in the earlier cases has been materially modified in the later ones. Dividends of cash are now held to belong to the life tenant, and stock dividends to the remainderman, subject to an examina *48 tion of the facts. And the circumstances in each case control in the application of the rule.
In Bouch v. Sproule, L. R., 12 App. Cas., 385, the board of directors created a fund out of the earnings which they reserved for contingencies of the business and issued a bonus or stock dividend to shareholders. The court held that the directors having exercised their judgment in good faith by adding these earnings to the capital, the life tenant was not entitled to them. The court quote with approval the following from the opinion of the lower court: “'When a testator or settlor directs or permits the subject of his disposition to remain as shares or stock in a company which has the power either of distributing its profits as dividend or of converting them into capital, and thé company validly exercises this power, such exercise of its power is binding on all persons interested under the testator or settlor in the shares, and consequently what is paid by the company as dividend goes to the tenant for life, and what is paid by the company to the shareholder as capital, or appropriated as an increase of the capital stock in the concern, enures to the benefit of all who are interested in the capital.”
The Pennsylvania rule as announced in Earp's Appeal, 28 Pa., 368, is that ordinary dividends on stock held in trust belong to the person entitled to the income of the trust fund, but that extraordinary dividends should be apportioned between the life-estate man and the remainderman in accordance with the amount thereof accumulated before and after the creation of the trust.
*49 In Smith’s Estate, 140 Pa., 344, the rule stated in Ear p’s Appeal is restated as follows: “When the stock of a corporation is by the will of a decedent given in trust, the income thereof for the use of a beneficiary for life, with remainder over, the surplus profits, which have accumulated in the lifetime of the testator but which are not divided until after his death, belong to the corpus of his estate; whilst the dividends of earnings made after his death are income, and are payable to the life tenant, no matter whether the dividend be in cash, or scrip, or stock.”
The Massachusetts doctrine, was stated in Minot v. Paine, 99 Mass. 101, as follows: “A simple rule is, to regard cash dividends, however large, as income, and stock dividends, however made, as capital,” The Massachusetts courts have consistently followed this holding, but in some of the cases have inquired into and determined the question whether a stock dividend was in effect a distribution of cash and, therefore, to be treated the same as a cash dividend.
In Minot v. Paine, supra, it is said: “It is obvious that, if the directors had made no stock dividend, but had invested the income in permanent improvements, making no increase of the number of shares, the improvements would have been capital, belonging to the legatees in remainder. So, if they had thus invested it, and, instead of increasing the number of shares, had increased their par value, the shares would have been mere capital, and not income, as to the shareholders, though increased in ¡value by the application of the net income of the *50 ¡road to that purpose. So, when they increase the number of shares, each share of all the stock in the corporation is in its nature capital. The new shares táke ■ their place among the old ones; and each- of the old shares thereby becomes a less proportion of the whole stock than it was before, and is entitled : to a less proportion of dividends declared than it was -before-. It may be that dividends are less per cent, than they would otherwise have been, and in such- case the old stock -is diminished in value, and the interest of- the remainderman is injuriously affected. But, on the other hand, the effect may be, ■by increasing the business of the road, tó increase .the dividends' and the -market value of the old stock. But neither courts nor -trustees can investigate such matters with accuracy; and in many cases no investigation can be made.” Practicálly the same question here involved was under consideration by the United States supreme court in Gibbons v. Mahon, 136 U. S., 549. The question was whether .-new shares of stock in the Washington Gas Light Company were to be treated as dividends, to the whole or part of which- the plaintiff was entitled under the will, or were to be treated as an increase of the capital of the trust fund, and -the plaintiff therefore entitled to receive only the income thereof.
Mr. Justice Gray in announcing the decision says: “The distinction between the title of a corporation, and the interest of its members or stockholders, in the property of the corporation, is familiar and well settled. The ownership of that property is in the ..corporation, .and not in the holders of shares of its stock.. The interest of each stockholder consists in *51 the right to' a proportionate part of the profits whenever dividends are declared by the corporation, during its existence under its charter, and tó a like proportion of the property remaining, upon the termination or dissolution of the corporation, after payment of its debts. Van Allen v. Assessors, 3 Wall., 573, 584; Delaware Railroad Tax, 18 Wall., 206, 230; Tennessee v. Whitworth, 117 U. S., 129, 136; New Orleans v. Houston, 119 U. S., 265, 277;
“Money earned by a corporation remains the property of the corporation, and does not become the property of the.stockholders, unless and until it is. distributed among them by the corporation. The corporation may treat it and deal with it either as profits of its business, or as an addition to its capital. ’ •. Acting in good faith and for the best interests of all concerned, the corporation may'distribute its earnings át once to the stockholders as income;.or it may reserve part of the earnings of a prosperous year to make up for a possible lack of profits in future years; or it may retain portions of its eatnin'gs and allow them to accumulate, and then invest them in its own works and plant, so as to secure find increase the permanent value of its property.”
Judge Gray further says, at page 559: “In ascertaining the rights of sucia persons, the intention of the testator, so far as manifested by him, must of course control; but when he has given no special direction upon the question as to what shall be considered principal and what income, he must be presumed to have had in view the lawful power of the corporation over the use and apportionment of its earnin'gs, and to have intended tlaat the determina-^ *52 tion of that question should depend upon the regular action of the corporation with regard to all its shares.”
As already stated, this question has been considered in many of the courts in this couiitry and in England, Rarely has a question arisen that has been so troublesome or has resulted in greater difference in views. It would be impossible to reconcile the decisions of the different courts. It is everywhere conceded that the conclusions reached have not conformed to any fixed rule, but have generally come within one of the three rules we have heretofore stated. It would be unprofitable and would extend this opinion to great lengths to attempt to analyze the adjudications.
The supreme court of Delaware in Bryan v. Aiken, 86 Atl. Rep., 674, in an able opinion reversing the decision of a lower court, recently adopted the Pennsylvania rule.
The courts of New York, with various modifica? tions, have followed the same rule, and in the re? cent case In re Osborne, 209 N. Y., 450, decided December 3, 1913, the court of appeals of New York reviews the decisions in that state on the question, arriving at the same conclusion, with the exception that under the circumstances of that case the court: directed that there should be an apportionment in such a way as to preserve the integrity of the trust: fund; and surplus earnings before the creation of the trust or purchase of the stock are to be treated as á part of the capital of the trust fund. This modification was not concurred in by Judge Gray, who had formerly announced the rule in its more rigid form.
*53 There is presented in this case a phase of the question which is different from that in most of the cases referred to in that the final distribution to the trustees was made in liquidation of The Latrobe Steel Company after it determined to go out of business. A number of courts have taken the view that this is a different matter from the disposition of earnings and dividends declared by corporations in active business and while they are going concerns. Among them are Second Universalist Church of Stamford v. Colgrove, 74 Conn., 79; Curtis, Trustee, v. Osborn, 79 Conn., 555; Bulkeley, Exr., v. The Worthington Ecclesiastical Society, 78 Conn., 526; Brownell, Trustee, v. Anthony, 189 Mass., 442.
In Bulkeley v. Worthington, which was a case of liquidation, the court say: “Judged by this test the votes of the directors, pursuant to which the cash in question was paid to Raymond, were in no true sense declarations of cash dividends within the meaning and intent of the rule. They were not passed by the directors in the exercise of their discretionary powers in determining what of the corporate assets representing surplus should be separated and withdrawn from that body of them to be retained for future corporate use, and, thus separated, go out to shareowners as income freed from all claim of the corporation thereon. There was no purpose on the part of the directors to make a division of profits, as such, among the owners of shares which were to continue to exist. The company was engaged in liquidating its business and distributing all its assets to its stockholders. The end sought *54 was the return to the owners of stock of all that the company owned, and it's distribution to them in" exchange or substitution for the shares which thereafter were to cease to exist. The directors were called upon to exercise no discretion. They had but' a'single duty, and that was to distribute everything in their hands, and they performed that duty as to cash and stocks in like manner.”
1 In spite of the irreconcilable differences in the’ conclusions arrived at there are a few general propositions as to which there is substantial agreement, among them, that there should be no arbitrary* rigid rule which would prevent the court from looking into the facts and circumstances of each case to determine the rights of the parties according to justice and,equity; that the earnings of a corporation are and remain' its property until it distributes them among the stockholders; that when acting in good faith and for the best interests of all' concerned, the corporation may reserve the earnings óf a prosperous year to make up for a possible lack' of profits in future years, or it may retain portions of its earnings and invest them’ from time to time in the improvement and extension of its plant and in general betterments, and thus increase the value’ of its permanent property and assets; that the intention of the testator, to be derived from the language employed in the creation of the trust and from the relation of the parties to each other and to the circumstances of the case, must control. It is also a reasonable view. that’when no special direction is given in the’ will creating the trust ás to what shall be ’ considered principal "and *55 what income, the testator will be presumed to have had in mind the legal authority of the corporation to treat- its assets as above stated, and to have contemplated that the income would only come from the order of the company itself acting ■in good faith.
In the case we have here, the testator, in his will, after the clause providing for the appointment of the trustees and the provision that they should hold all of his estate in trust, with power to sell and corivey- the real estate, and to sell, dispose of and collect all of the securities and invest and reinvest ■the proceeds thereof, and, “after paying expenses, ■to pay the entire net income from my said estate, to my wife, during her lifetime,” provides “if it becomes necessary, in the judgment of said trustees, to use any part or all of the principal, of my estate for the support and care of my said wife, the same shall be so used.”
•Two things manifest by these provisions ¡are: First, his desire to provide for the support and care of his wife, even if it took a portion or . all of the principal,, and, second, to give the trustees full power with reference to the investment and reinvestment of the. estate itself. ■’ So far as the steel enterprise was concerned-there were, as already stated, two material changes while the estate was in heir possession—one when the steel works were merged in the steel company in-1895,- and another when the latter company dissolved and .distributed its assets among its stockholders in 1905 and 1906. Was the $25,000 additional stock which-the .trustees received in the .stock of. the new company *56 distributable to the widow as net income within the meaning of the will ? We think not. At the death of the testator himself the old company already had a surplus of $187,387.16. At the time of the merger into the new company the old company had a book surplus of over $800,000, practically all of which was invested in the real estate, machinery, tools and other assets, there being in cash only $6,800. It must have been in the contemplation of the testator when he made his first, investment in the stock of the company, as well as when he made his will, that the company would strive to increase its business and extend its operations in every usual and ordinary way. He must have had in mind that the company would exercise its right to use its resources in that behalf as it had done during his life. He contemplated that the company would incur the ordinary risks and hazards of similar enterprises. He was a director until a short time before his death and must have participated in the adoption of its policy.
The legislation and the adjudications of the courts of the country, have responded to a wholesome public sentiment in throwing around the assets of corporations every safeguard, and in preventing the encroachments of greedy organizations, in restraint of trade or in building up monopolies, but there has been no decision, legislation or sentiment against the growth of legitimate corporate enterprises to assist in the development of the resources of the nation.
It is doubtless true that if the company had not increased its plant, machinery, operating capital *57 and resources, offensive and defensive, it could not have remained a formidable factor in the business, and would not have been able to pay the life tenant the large dividends which she received for many years on the principal of the fund as left by the testator. The 20 per cent, annually which she received for a number of years on the $50,000 stock was equivalent to 40 per cent, annually on the stock the testator owned at his death. It cannot be said under this state of facts that the increase of the corporate assets and property was done at the expense of the tenant for life for the sole benefit of the remaindermen as was suggested by the supreme court of Delaware in Bryan v. Aiken, supra, in reference to the situation in that case. Here the life tenant got the benefit of the increased earning power which resulted from the growth and extension of the corporation and its business. Every step forward which it took helped the life tenant and increased her dividend. The testator intended that the trustees should have the right to allow the investment to remain in the stock, and that the annuitant and the remaindermen should thereby take all the risks and enjoy all the benefits in their several capacities which he would have taken and enjoyed if he had lived himself and had united in his own holding such risks and such privileges. Suppose it to be conceded that the remaindermen are not entitled to any of the increase of the value of the stock and that this must go to the life tenant as income, then the remaindermen were not interested at all in leaving the investment in the business subject to the risks and hazards of a company *58 involved' in the fierce competition necessarily encountered in the business in which this company was. It is well known that its competitors were among the most powerful organizations in the. co'üntry. . Therefore, under such' a state of facts and law the remaindermen might well havfe insisted that the stock be sold after the death of the testator for the $25,000, or such súm as it might bring in the market, and the proceeds be invested in-accordance with the statutes of Ohio for the investment of trust estates.
'. In súch case the interest on. the investment which the life tenant would receive would be very small,but'the remaindermen would be sure of the princi-'' pal of the fünd whén they should succeed to- it. By running the risks of the business they would gét.no more in case of the company’s success and Would lose all in case of its failure. For another reason we cannot approve the view that the additional stock1 in the new company was the receipt by the-trustees of “income” to which the widow was ''entitled as- life annuitant. Such additional stock car-' tied- with it an interest not alone in-all of the permanent improvements and exteiisions of the plant, the good will and other assets, all of which were capitalized by the act of the company, with the consent of all stockholders, but such ádditional stock had an ■interest in the preexisting capital of the old company, all'of which was turned over to the new company:- W'e think it clear this'was not the intention of the testator. He intended that the trusteés should have the poWer to sell the stock if they deemed that best or to hold it in case they considered that to be *59 best. . He must have' hoped the business would be successful and the. company continually, .pay out comfortable incomes which, the widow and son would enjoy. So far as the fund distributed on the dissolution of the company is concerned, there was no distribution of income, dividend- or profit; It was simply dividing up the entire assets of the corporation after the payment of its debts among those who owned, the assets of the corporation, to^ wit, the stockholders. . On this aspect of the case we think the authorities hereinbefore referred to' establish the proposition stated and that it is founded on -and sustained by sound reasoning; -'It would be practically impossible to' trace, back all of the final assets to their source and determine . sup? posed equities between life tenant and-remainder-men. Who shall say even in this day óf expert ac-„ countants where the dividing line is unless an.- arbitrary line is fixed ? Trustees would either be conL peljed to assume the risk of a proper segregation or constantly apply to courts for direction.
In 1905 the company passed $300,000 to the-contingent fund and;$62,521.05 to profit and loss; There is no reason shown on the statement if or this; It was in line with the policy of -the company when active, but-ias.the company had theretofore determined to soon cease operations and did so in a year or so thereafter; these sums should, so far as the portions thereof received by the trustees are concerned; be treated as income.
Mrs. Chapman and her son, -the life annuitants, executed a paper in which it is stated that they severally ratify, adopt, fully approve and confirm *60 all matters connected with said administration and trusteeship, and “find said detailed statement a true and accurate statement of all the assets comprising said trust estate, * * * said Mrs. F. M. Chapman further acknowledging receipt by her in full to date of the entire income from said trust estate.”
It is claimed by the trustees and the remainder-men that this was acquiesced in by Mrs. Chapman during her life and by the son and that all persons claiming under them are now estopped from asserting the interest which they now claim. To this it is replied that the relations of the trustees to Mrs. Chapman and her son were those of trust and confidence; that in the nature of the case they relied upon the counsel and advice of the trustees with reference to this matter and every other matter connected with the trust; that, therefore, the paper referred to cannot be regarded as binding upon the life annuitants in the sense that ít would be if the parties had been dealing at arms’ length. There is much force in this contention, but in the view we have taken of the legal status of the fund itself it is not necessary that we should determine the effect of the paper in question.
The judgment below will be modified as above indicated and as modified will be affirmed.

Judgment modified.

Nichols, C. J., Donahue, Newman and Wilkin, JJ., concur. Wanamaker, J., dissents.