THE SECOND UNIVERSALIST CHURCH OF STAMFORD ET AL.
*vs.* HARRIET COLEGROVE.

Third Judicial District, New Haven, June Term, 1901.
ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

A mining company had set aside and invested, from the proceeds of working its mines, large sums from time to time, to an amount which finally exceeded its capital. By concerted, though individual action, the shareholders, at the recommendation of the directors, then sold their shares at a high premium, under a contract

with the buyer by which certain specified assets representing part of this reserved surplus, should be "reserved out of the interests in said property passing to the purchasers" by reason of the transfers of the shares, and the former shareholders should "receive the benefits of said reserved assets." Provision was then made by the directors for turning these assets into cash, under the management of trustees appointed for the purpose, and a dividend "of the said assets" payable by these trustees at a future time was voted, and afterwards paid. *Held* that this transaction was substantially a liquidation of the affairs of the company as they had been conducted under the old management; that those receiving the dividends took them not as shareholders but because they had formerly been shareholders; and therefore, as between a remainderman and the holder of a life interest in shares thus sold, the moneys divided were capital and not income.

Argued June 4th—decided July 23d, 1901.

AMICABLE suit to determine the rights of the parties in and to a dividend upon shares of stock held under a testamentary trust, brought to the Superior Court in Fairfield County and reserved by that court, *Robinson, J.*, for the consideration and advice of this court.

The testator died June 4th, 1895, leaving a will executed in 1893. His executors, soon afterwards, transferred to the society's committee as trustees, the shares of stock referred to in the following clause of the will: "I give and bequeath to the trustees of the Second Universalist Church of Stamford, Connecticut, situate in the Borough of Stamford, one hundred shares of the capital stock of the Pennsylvania Coal Company in trust, to pay from and out of the dividends and income from said stock the one-half thereof to Lot Mead Hubbard and his sister, Harriet Colegrove, children of Andrew Hubbard, deceased, or to the survivor of them during their lifetime and the lifetime of the survivor, annually or semiannually, at the discretion of said trustees, and to use and apply the remaining one-half of said dividends and income in defraying the annual expenses of said Second Universalist Church. On the decease of both the said Lot Mead Hubbard and Harriet Colegrove, I give and bequeath said stock to the trustees aforesaid, to be by them used, at their discretion, in the support and maintenance of said Second Univer-

salist Church. Should a reorganization of said Pennsylvania
Coal Company be had after my decease, then it is my will
and I so direct, that said trustees reinvest so much of the
proceeds of and from said one hundred shares of said stock
as such number of shares will be entitled to of the shares of
the reorganized company or companies."

Said Pennsylvania Coal Company was organized in 1838,
and its organization continued in 1895, by acts of the legisla-
ture of Pennsylvania. The par value of its stock was at the
time of the making of said will, and had been for many years,
$5,000,000; and for many years and at the time of the mak-
ing of the will aforesaid, it had paid regular yearly dividends
of 16 per cent., being less than the amount earned. The ex-
cess not used for dividends or in the business of the company
was invested in stocks, bonds and other securities. This
excess fund stood upon the books of the company as a "Coal
Land Renewal Fund," and as surplus. The purpose of the
former fund was to replace coal lands owned by the company
which should become mined out, by the purchase of other
coal lands. On May 30th, 1895, the Coal Land Renewal
Fund stood upon the books of the company at $4,500,000,
and the surplus at $4,012,701.08.

At the time of making his will and at the time of his death,
the testator was a large holder of the stock of this company,
owning 1,155 shares, and knew of the existence and approxi-
mate amount of the funds aforesaid.

In December, 1900, and January, 1901, substantially all
the shareholders in the company, including the society's com-
mittee, sold their shares to J. P. Morgan & Co. for $276 a
share (the par value being $50), under an agreement that
certain specified assets should "be reserved out of the inter-
ests in said property passing to the purchasers by reason of
the sale and transfer of said stock, and that such action shall
be taken by the present board of directors of said Pennsyl-
vania Coal Company as shall secure to the stockholders of
record upon such date as may be fixed by the present board
of directors, not later than January 15th, 1901, the right to
participate in and to receive the benefits of said reserved as-

sets, to the exclusion of the purchasers under this contract
and all persons claiming under them." The assets reserved
were all cash and coal on hand on January 15th, 1901; all
bills and accounts receivable, less bills and accounts payable,
as of that date; all loans due to the company; and most of
its stocks and bonds which were "held for investment."

The agreement further provided that "said reserved assets
or their equivalent, may be paid by the Pennsylvania Coal
Company to its stockholders of record at the time of the
closing of the books of the Company, prior to delivery of
control to Messrs. J. P. Morgan & Co. or their assigns; in
other words, that the stock delivered to J. P. Morgan & Co.
is not to carry with it any interest in the reserved assets.
But in order that the total amount payable to each stock-
holder hereunder, and also for his distributive share in such
reserved assets, may be made in one payment, Messrs. J. P.
Morgan & Co. will pay to the subscribing stockholders their
respective shares of such reserved assets, as directed, by and
for account of the Pennsylvania Coal Company, upon deliv-
ery to them in cash of the amount so to be distributed to
such subscribing stockholders; but Messrs. J. P. Morgan &
Co. shall have no claim, nor any other commitment, with re-
lation to such reserved assets."

The board of directors of the company, early in January,
1901, after reciting that J. P. Morgan & Co. "as soon after
January 15th, 1901, as they shall have acquired and paid for
a majority of the capital stock of the company, will desire to
assume the direction and control of the company," and that
"before surrendering such control" the board desired "to
distribute among the stockholders of record on January 8th,
1901," the reserved assets "representing accumulated and
undivided profits of the Company, which the said purchasers
have agreed to except from the operation of said purchase,"
resolved as follows:—

"I. That a dividend be and the same hereby is declared
on the capital stock of this company, consisting of the said
assets, payable as hereinafter directed, to the stockholders
of record at the close of business on January 8th, 1901.

" II. That the officers of the Company forthwith transfer, assign, pay over and deliver to Samuel Thorne, John W. Sterling and James N. Jarvie, the said assets, in trust, for the following uses and purposes: 1. To hold the same for the benefit of the stockholders of record of this Company, at 3 P. M., January 8th, 1901. 2. To convert the same into cash in such manner and at such times as, in their absolute judgment and discretion, shall be deemed advisable. 3. To pay on January 15th, 1901, through Messrs. J. P. Morgan & Company, to the said stockholders of record on January 8th, 1901, so much of the net proceeds as may then have been realized from the said assets, not exceeding 200 %, and, as speedily thereafter as possible, to pay the balance of such net proceeds to the said stockholders of record on January 8th, 1901, at such times and in such installments as the said trustees or the survivors of them may determine."

The society's committee received for their shares $276 a share, and also $10,000 paid on account of the reserved assets.

The question reserved was whether this $10,000 was to be regarded as principal or income.

*John E. Keeler* and *Lewis S. Haslam*, for the plaintiffs.

*Wilbur S. Wright*, for the defendant.

BALDWIN, J. The Pennsylvania Coal Company was engaged in the business of mining coal. Shares in such company are a wasting investment. There are two modes of conducting its affairs. The capital invested in a mine may be gradually paid back to the shareholders in the shape of dividends from the proceeds of working it; or part of these proceeds may be retained, for reinvestment, from time to time, in the purchase of new mines to take the place of the old ones as they become exhausted or unprofitable. Morawetz on Priv. Corp. §§ 442, 830.

The Pennsylvania Coal Company adopted the latter policy. It established a large " Coal Land Renewal Fund " and also

put aside a "Surplus" fund, each of which, in 1901, was nearly or quite as large as its capital stock.

The testator contemplated the possibility of a reorganization of the company, and made a certain provision for that contingency. The only mode of reorganization which he had in mind was the creation of one or more companies to succeed to its business and property. There is another mode, by which the corporate organization remains externally the same, but the ownership and control is changed from within, by a transfer of the shares to a new set of shareholders, through their individual but concerted action. Such action was taken by the shareholders of the Pennsylvania Coal Company, and the resolution adopted by the directors was in furtherance of it. The manifest purpose was to enable the purchasers of the stock to continue the business of the corporation upon the same basis of nominal capitalization, but without participation in a considerable portion of the profits previously accumulated. *Woodbridge* v. *Pratt & Whitney Co.*, 69 Conn. 304, 330. There was, in effect, a liquidation of the affairs of the company, as they had been conducted under the old management.

The dividend declared from these accumulated profits was not a stock dividend. That mode of distribution was not possible; for the object of the whole transaction was to cut off the old shareholders from any future participation in the concerns of the company. The provisions of the Public Acts of 1889, p. 41, Chap. 72, therefore do not apply.

Nor was it a cash dividend. It was in terms one consisting of certain specified assets. While the cash which might be on hand at a certain future date was included, its amount was not and could not be stated. The other assets were to be converted into cash; but this was to be effected by trustees, under an active trust which might endure for a considerable period of time. These trustees were substantially in the position of liquidators. The sums which they might ultimately realize and pay over were uncertain. The beneficiaries of the trust, to whom the payments were to be made, were to receive them not as shareholders in the company, but because they had formerly been shareholders.

The $10,000 received by the society's committee is therefore to be regarded as a part of the accumulated property or "floating capital" of the corporation distributed in liquidation, and belongs wholly to the capital of the trust fund. *Gifford* v. *Thompson*, 115 Mass. 478; *D'Ooge* v. *Leeds*, 176 id. 558, 57 Northeastern Rep. 1025.

The Superior Court is so advised.

No costs will be taxed in this court in favor of either party.

In this opinion the other judges concurred.