E. Y. SARLES, Acting in His Own Behalf and All Those Similarly Situated, v. SCANDINAVIAN AMERICAN BANK & NORTHWESTERN TRUST COMPANY, of Grand Forks, North Dakota, and Ingeman & Company, a Corporation.

(156 N. W. 556.)

Action by minority stockholder to enjoin the directors of two affiliated banking institutions from proceeding with the erection of a five-story, fire-proof building upon the grounds that the investment exceeds 30 per cent of their

capital stock and unimpaired surplus as prescribed by § 5151, Comp. Laws 1913.

Minority stockholder — action by — directors — injunction — capital stock — surplus — evidence — sale — bona fide transaction.

1. Evidence examined and, *held*, that the sale of a certain lot by said institutions to one Reid is bona fide.

Undivided profits — use of — capital stock — unimpaired surplus — banking building.

2. Section 5151, Comp. Laws 1913, does not prohibit the use of the undivided profits in the aid of the 30 per cent of the capital stock and unimpaired surplus for the erection of such banking building.

Opinion filed December 29, 1915.

Appeal from the District Court of Grand Forks County, *Cooley,* J. Affirmed.

*George A. Bangs* and *George R. Robbins,* for appellant.

The plaintiff, a minority stockholder in the corporations, defendants, has the right to maintain this action and to the injunctional relief asked.    10 Cyc. 968, 985, 986; 2 High, Inj. §§ 1203–1205, 1207; 3 Pom. Eq. Jur. 3d ed. 1093; 2 Clark & M. Corp. 539, pp. 1667–1673; 4 Thomp. Corp. § 4502; 5 Thomp. Corp. § 5693; Stewart v. Erie & W. Transp. Co. 17 Minn. 372, Gil. 375; Dodge v. Woolsey, 18 How. 331, 341, 15 L. ed. 401, 404; Manderson v. Commercial Bank, 28 Pa. 379; Dunbar v. American Teleph. & Teleg. Co. 224 Ill. 9, 115 Am. St. Rep. 132, 79 N. E. 423, 8 Ann. Cas. 57; Pratt v. Pratt, R. & Co. 33 Conn. 446; Northern Trust Co. v. Snyder, 113 Wis. 516, 90 Am. St. Rep. 867, 89 N. W. 460; Byrne v. Schuyler Electric Mfg. Co. 65 Conn. 336, 28 L.R.A. 304, 31 Atl. 833; Knapp v. Supreme Commandery, U. O. G. C. 121 Tenn. 212, 118 S. W. 390.

The state banking law was taken from the national banking law, largely.    Comp. Laws 1913, §§ 5146 et seq.; U. S. Rev. Stat. § 5133, Comp. Stat. 1913, § 9658; State v. Scougal, 3 S. D. 55, 15 L.R.A. 477, 44 Am. St. Rep. 756, 51 N. W. 858; State v. Richcreek, 167 Ind. 217, 5 L.R.A.(N.S.) 874, 119 Am. St. Rep. 491, 77 N. E. 1085, 10 Ann. Cas. 899; Weed v. Bergh, 141 Wis. 569, 25 L.R.A.(N.S.) 1217, 124 N. W. 664.

Congress has no inherent power to create corporations, but the bank-

ing law is sustained as a means to accomplish a result or end within the power of Congress. M'Culloch v. Maryland, 4 Wheat. 316, 4 L. ed. 579; Osborn v. Bank of United States, 9 Wheat. 738, 6 L. ed. 204; Farmers' & M. Nat. Bank v. Dearing, 91 U. S. 29, 23 L. ed. 196.

The state has power to create and provide for the creation of corporations, and under police power may forbid individuals to engage in banking, and require such business to be done by corporations. State ex rel. Goodsill v. Woodmansee, 1 N. D. 246, 11 L.R.A. 420, 46 N. W. 970; Weed v. Bergh, 141 Wis. 569, 25 L.R.A.(N.S.) 1217, 124 N. W. 664; Brady v. Mattern, 125 Iowa, 158, 106 Am. St. Rep. 291, 100 N. W. 358.

Banking associations formed under our statute have power to purchase, hold, and convey real estate for limited purposes and time. Comp. Laws 1913, § 5151; U. S. Rev. Stat. § 5137, Comp. Stat. 1913, § 9674; First Presby. Church v. National State Bank, 57 N. J. L. 27, 29 Atl. 320, affirmed in 58 N. J. L. 406, 36 Atl. 1129; Brown v. Schleier (8th C.) 55 C. C. A. 475, 118 Fed. 981, affirmed in 194 U. S. 18, 48 L. ed. 857, 24 Sup. Ct. Rep. 558; Weeks v. International Trust Co. 60 C. C. A. 236, 125 Fed. 373; Wingert v. First Nat. Bank, 99 C. C. A. 315, 175 Fed. 739; Farmers' Deposit Nat. Bank v. Western Pennsylvania Fuel Co. 215 Pa. 115, 114 Am. St. Rep. 949, 64 Atl. 374; First Nat. Bank v. Com. 143 Ky. 816, 34 L.R.A.(N.S.) 54, 137 S. W. 518, Ann. Cas. 1912D, 378; Union Nat. Bank v. Matthews, 98 U. S. 621, 25 L. ed. 188.

Banking corporations cannot loan to any one person any amount in excess of that allowed by statute. Neither can they invest in buildings more, or any greater sum, than that allowed by statute. The statute law is their fixed and definite guide. Comp. Laws 1913, §§ 5151, 5172; Briggs v. Spaulding, 141 U. S. 132, 35 L. ed. 662, 11 Sup. Ct. Rep. 924; Thompson v. Sioux Falls Nat. Bank, 150 U. S. 231, 37 L. ed. 1063, 14 Sup. Ct. Rep. 94; Union Gold-Min. Co. v. Rocky Mountain Nat. Bank, 96 U. S. 640, 24 L. ed. 648, 1 Mor. Min. Rep. 432; O'Hare v. Second Nat. Bank, 77 Pa. 96.

There is a distinction between capital and capital stock of a corporation. The capital of the corporation is the property or means which the corporation owns, and it may vary in amount while the capital stock

is fixed and represents the interest of the stockholder and is their property. Wells v. Green Bay & M. Canal Co. 90 Wis. 452, 64 N. W. 72.

*Bangs, Netcher, & Hamilton,* for respondents.

"Capital stock, the sum fixed by the corporate charter as the amount paid in, or to be paid in, by the stockholders, for the benefit of corporate creditors." 6 Cyc. 348.

A bank has general inherent power and right to erect and maintain suitable quarters, and to contract for and lease suitable sites, for the accommodation of its business. Brown v. Schleier, 55 C. C. A. 475, 118 Fed. 981, affirmed in 194 U. S. 18, 48 L. ed. 857, 24 Sup. Ct. Rep. 558; Farmers' Deposit Nat. Bank v. Western Pennsylvania Fuel Co. 215 Pa. 115, 114 Am. St. Rep. 949, 64 Atl. 374; Wingert v. First Nat. Bank, 99 C. C. A. 315, 175 Fed. 739; Weeks v. International Trust Co. 60 C. C. A. 236, 125 Fed. 373; Banks v. Poitiaux, 3 Rand. (Va.) 136, 15 Am. Dec. 709; Noble State Bank v. Haskell, 22 Okla. 48, 97 Pac. 605.

A stockholder has no right or claim to a dividend or to undivided profits, until same is regularly declared; until that time the earnings belong to the corporation, and, in the absence of fraud, may be handled or disposed of according to the honest judgment of the managing officers and directors. Minot v. Paine, 99 Mass. 106, 96 Am. Dec. 705; Gibbons v. Mahon, 136 U. S. 549, 558, 34 L. ed. 525, 527, 10 Sup. Ct. Rep. 1057; Williams v. Western U. Teleg. Co. 93 N. Y. 187; Garland v. Rives, 15 Am. Dec. 762, note; Barry v. Merchants' Exchange Co. 1 Sandf. Ch. 304.

"The word 'capital' applied to corporations is often used interchangeably with the words 'capital stock,' and both are frequently used to express the same thing,—the property and assets of the corporation." 10 Cyc. 364, 365; Christensen v. Eno, 106 N. Y. 97, 60 Am. Rep. 429, 12 N. E. 648; 6 Cyc. 348.

Burke, J. The Scandinavian American Bank and the Northwestern Trust Company are financial institutions organized under the state laws, and located at Grand Forks. Upon their organization they were affiliated in the following manner: The shareholders are identical, each owning stock in the proportion of one share in the trust company and two shares in the bank. The plaintiff owns 8⅔ per cent of the stock of

each corporation. In the spring of 1912 the directors had decided upon the erection of a five-story fire-proof building, 90′ x 100′, and had purchased a suitable lot. In 1914 the directors adopted plans for such building and ascertained that the completed and furnished building would cost approximately $160,000, exclusive of the site. Plaintiff vigorously protested against the expenditure of so large a sum for building purposes and made several ineffectual efforts to call a meeting of the stockholders to discuss the matter. As a large majority of the stockholders favored the erection of the building, no meeting was held, but plaintiff gave timely notice through a written protest. At said time the bank had a capital of $200,000; the trust company, a capital of $100,000; the bank had $80,000 surplus, and the trust company had $20,000 surplus, making a total of $400,000 capital and surplus, of which under § 5151, Comp. Laws 1913, said corporation was allowed to spend 30 per cent for banking house, furniture, fixtures, and land upon which the building is located. In addition to the capital and surplus the bank had $26,360.56 and the trust company, $16,895.34 undivided profits, a total of $43,255.90, and at the same time the bank had $11,-000, and the trust company, $6,000, nonledger assets. If 30 per cent of the capital and surplus be added to the undivided profits of both institutions, we have $163,255.90,—more than the cost of the building alone. About this time the directors of the affiliated institutions sold the lot to one Hugh Reid, a stockholder and director of both companies, for the consideration of $60,000, and he in turn leased said lot to the affiliated corporations for ninety-nine years, giving the said institutions an option to purchase said lot at any time within twenty years, upon payment of the amount of money which he had invested with interest. Provisions were further made for the payment of rental in the interim. The first dispute arises over this transaction. Plaintiff insists that this was a mere subterfuge and an evasion of the law. That there was, in fact, no sale, but that the bank continued to be the real owner of the lot. The defendant, on the other hand, insists that the sale was bona fide although made to reduce the investment to comply with § 5151, Comp. Laws 1913, aforesaid. This dispute will be considered and decided in paragraph 1 of this opinion. The other questions involve an interpretation of § 5151, Comp. Laws 1913, and principally whether the institutions can spend their undivided profits upon the

building in addition to the 30 per cent of the capital stock and surplus. This will be treated in paragraph 2.

(1) While this is a trial *de novo,* we do not feel called upon to reproduce any large portion of the evidence, but will content ourselves with announcing our findings of fact upon a very abbreviated *résumé* of the evidence. As we have already stated, this lot was bought in 1912 for $60,000, of which $30,000 had been paid and upon which $30,000 was still owing. Plaintiff declares: ."We believe the entire transaction is a bald, naked sham; that it was not entered into in good faith, and that it is a mere paper transaction,—a subterfuge; that the bank yet remains the owner of the real estate and that Reid has not now, and never has had, any interest therein."

When it comes to the proof, however, we find nothing tangible supporting this declaration. The officers of the bank and trust company and Mr. Reid were the only witnesses called. Their testimony is to the effect that in order to reduce the investment in the building to less than $160,000 it had been decided to sell the lot; that thereupon a sale was made to Reid, who assumed the $30,000 indebtedness upon the lot and gave his note to the bank for the other $30,000; that said note was later renewed and sold to the First National Bank of Minneapolis and the money received by the defendant bank; that a written lease of the lot was executed between Reid and the defendants, which lease contained an option to purchase within twenty years upon paying to Reid the amount of his investment, with interest. No evidence was offered to contradict this testimony, but upon cross-examination it was shown that Reid was a director in both the bank and trust company, and that there were many circumstances going to show a very close relationship between Reid and the other directors. It was also established that at the time of the trial Reid had not reimbursed the bank for interest advanced by them for him, but it was to be taken care of later by him. We agree with plaintiff that the sale was a friendly arrangement, and that there was an understanding that the bank could repurchase the lot as soon as its capital and surplus made the transaction legal. In fact, the defendants do not seriously deny this situation themselves. Nevertheless, the bank's investment was actually reduced $30,000 by the sale of their equity in the lot to Reid. The undisputed evidence shows that they have the money and that Reid has the lot. Upon the whole

we are satisfied that there was a sale; that Reid now owns the lot, and the bank has the money, and that, therefore, the amount of the bank's investment is less than $160,000. It must be kept in mind that this action presents different questions than would one brought by the bank examiner in an effort to punish the institutions for a violation of law. Plaintiff is a minority stockholder. His principal grievance is the manner of using his capital and prospective dividends. He does not claim insolvency of the institutions. It is too clear for argument that this court cannot interfere in the management of the business affairs of a banking corporation. It is practically conceded that the officers of the bank and trust company believed the old quarters inadequate; that they could not be enlarged in the old building; that, in the judgment of said directors, the erection of a new building would greatly increase the business of the institutions, and that in their best judgment the erection of a building was a good business venture. It is our conclusion that the sale of the lot was bona fide.

(2) This brings us to the consideration of the second proposition, involving the right of the corporations to expend their undivided profits upon this venture. Section 5151, Comp. Laws 1913, reads: "It shall be unlawful for any corporation having banking powers and a capital stock of $20,000 or more, to invest over 30 per cent of such stock and unimpaired surplus in banking house, furniture, and fixtures, including the lot, piece, or parcel of land on which such banking house is located. . . ." Appellant contends that § 5151, supra, places a positive limitation upon the expenditures from any source whatever, while the defendants maintain that they may invest the 30 per cent of the capital stock and unimpaired surplus, and in addition any reasonable amount of its undivided profits or nonledger assets. In discussing this question we must remember that this action is not brought by the bank examiner to punish the bank for violation of law, nor is it an action for a receiver instituted by the stockholder who believes the institution has been mismanaged.

We must also remember that § 5151 was doubtlessly enacted to insure the solvency of financial institutions, thus protecting depositors, and to keep 70 per cent of the capital and surplus of the bank intact for legitimate banking needs. The rights of the minority stockholders are protected by other provisions of the Code. It is also well to remember

that there is a sharp distinction between undivided profits and surplus. Surplus, like the capital stock, constitutes the working capital of the bank, and is, in addition, a fund for the protection of depositors. The undivided profits, on the contrary, is a temporary fund changing in size from day to day and carried only until dividend periods, when it is distributed to the stockholders or transferred to the permanent surplus. It is the fund from which the expenses and losses of the bank are paid. It is also well to remember that the interests of the stockholder and of the depositors in a mild manner clash upon the distribution of such profits. If the dividends are paid out to the stockholders they become lost to the corporation, while, if no dividends are declared, and the fund is transferred to the permanent surplus or invested in property belonging to the bank, the institution is strengthened. Thus the use of the $43,255.90, undivided profits, of the bank and trust company for building purposes, increased the assets of the bank in practically that amount. It also must be remembered that the bank examiner is making no complaint of the management of this institution, and is not a party to this action. In other words, plaintiff is dissatisfied with the management of the affairs of those financial institutions.

Keeping all those things in mind, we approach the question in dispute, does § 5151 prohibit the use of the undivided profits of the bank in the erection of a building? Said section prohibits the use of more than 30 per cent of the capital stock and unimpaired surplus for such purposes. It does not contain any prohibition upon the use of the undivided profits or nonledger assets for that purpose. We cannot say that the use of the undivided profits of those institutions in the erection of a building is calculated to injure that institution in any manner. Certainly it does no more harm than to distribute said fund as dividend. There is, therefore, no reason why the legislature should desire to prohibit the return of those prospective dividends to the assets of the bank. Being no law against said use and no reason for a law, it is easy for us to determine that such acts are not forbidden by said section. We so hold.

It is too clear for argument that courts will not interfere with the private management of corporations unless some violation of law is charged. When the stockholders organized those corporations they delegated to those directors the management of the funds within the

limits prescribed by law. Among those powers conferred upon the directors was the distribution of the undivided profits. Such directors can distribute the funds as dividend, place it in the permanent surplus or expend it for betterments. So long as they do not act fraudulently in so doing there is no reason to disturb their action. It is practically conceded that the directors in the case at bar are acting for what they consider the best interests of the bank, and it must be conceded that their action does not in any way impair the financial standing of said institutions.

It is our conclusion upon the whole that the allied corporations have not used to exceed 30 per cent of their capital stock and unimpair surplus in the erection of this building and the fixtures and furniture; that they had a right to use their undivided profits upon the same building; and, therefore, the total investment of the bank in this enterprise is within the limit established by law. Barry v. Merchants' Exch. Co. 1 Sandf. Ch. 280; 6 Cyc. 348; Brown v. Schleier, 55 C. C. A. 475, 118 Fed. 981, affirmed in 194 U. S. 18, 48 L. ed. 857, 24 Sup. Ct. Rep. 558; Noble State Bank v. Haskell, 22 Okla. 48, 97 Pac. 605; Banks v. Poitiaux, 3 Rand. (Va.) 136, 15 Am. Dec. 709; Minot v. Paine, 99 Mass. 101, 96 Am. Dec. 705; Gibbons v. Mahon, 136 U. S. 549, 34 L. ed. 525, 10 Sup. Ct. Rep. 1057; Williams v. Western U. Teleg. Co. 93 N. Y. 162; Garland v. Rives, 15 Am. Dec. 762, note; 10 Cyc. 364, 365, 1155.

Judgment of the trial court is affirmed.


FISK, Ch. J. (concurring): I concur in the result announced in the majority opinion, and I fully concur in what is said as to the construction of § 5151 of the Compiled Laws; but as to the issue of fact involving the question of the bona fides of the transaction whereby the title to the lots was transferred to Reid and a ninety-nine year lease taken back to the bank and trust company, I am not prepared to concur in all that is said by my associates. I have read with care the testimony relating to such transaction, and I am convinced that there is much merit in appellant's contentions. However, I find it unnecessary to question the motives or the alleged good faith of the officers and directors in consummating such deal. They, no doubt, honestly believe

that by clothing the transaction in the garb of legal formality they could satisfy the mandate of the statute.

As I view it, the transaction not only as to this appellant, but as to the corporations and their creditors, is, regardless of the motives or the good or bad faith of those directly instrumental in negotiating and perfecting the deal, valid and binding. In other words, as to the appellant, as well as all persons concerned, the transaction will be treated, both at law and in equity, as a legal and binding one, and the validity thereof cannot be questioned either by Reid or by the corporations. The state possibly might do so, but I fail to see how a minority stockholder can successfully question it without first showing a threatened injury to his rights. And how can he be injured in his rights when, as to him, the transaction, even though intended to be in legal form merely, is in substance and effect valid and binding. In so far as appellant is concerned, Reid is the owner of these lots, and not the corporations, and the leasing contract cannot be questioned as to its legal and binding effect. Therefore appellant is in a court of equity asking for relief which he already has by virtue of the facts aforesaid. The injunction prayed for was properly denied.