HENRY H. WEHRHANE ET AL., EXECUTORS (ESTATE OF WILLIAM C. PEYTON) *v.* BERNARD PEYTON, EXECUTOR (ESTATE OF ANNE duPONT PEYTON)

HENRY H. WEHRHANE ET AL. *v.* BERNARD PEYTON, EXECUTOR (ESTATE OF ANNE duPONT PEYTON)

MALTBIE, C.J., BROWN, JENNINGS, ELLS and DICKENSON, Js.

Argued November 5, 1946—decided March 27, 1947

*Raymond E. Hackett,* with whom were *William G. Chambers* and *Archibald H. Cashion* of the New York bar, for the appellants (plaintiffs).

*Philo C. Calhoun,* with whom were *Otis T. Bradley* and *Alfred W. Haywood* of the New York bar, for the appellee (defendant).

MALTBIE, C. J. These cases are appeals taken by the executors under the will of William C. Peyton and by the same persons individually from the refusal of the Probate Court of the district of Greenwich to approve their final account as executors. By stipulation of the parties the only issue presented to the trial court was the correctness of a ruling of the Probate Court that certain dividends received by the executors upon stock forming a part of the estate were payable to the testator's widow as life tenant and not to the executors as individuals to whom in the latter capacity the property was given at her death. See *Peyton* v. *Wehrhane,* 125 Conn. 420, 435, 6 A.2d 313. The trial court sustained the ruling of the Probate Court and the executors as such and as individuals have appealed to this court. The widow died during the pendency of this action and her executor was substituted as a party, but we shall speak of the interest she had as that of the life tenant.

The testator died April 4, 1936, leaving a will dated October 29, 1934. A part of the residue of his estate consisted of 20,000 shares of Peyton-duPont, Inc., a Delaware corporation, to which we shall refer as the Peyton corporation, and notes aggregating about $100,000 executed by the corporation and payable to him. In 1937 the executors accepted 1,527 shares of stock of the corporation in satisfaction of these notes. Between the time of Mr. Peyton's death and the dissolution of the corporation in 1941, the executors received as dividends upon its stock an aggregate amount of $571,178.71; of this sum they

allocated $156,313.98 to the life tenant and $414,-864.73 to themselves as remaindermen. The issue before us arises out of the decision of the Probate Court, sustained by the Superior Court, that the latter sum also represented income to which the life tenant was entitled.

The trial court has made the exhibits offered at the trial a part of the finding. They include the principal account books of the Peyton corporation, the minutes of the meetings of its board of directors, and a financial statement of a corporation the assets of which were taken over by the Peyton corporation in the process of the reorganization hereinafter described. We shall use them to explain and supplement the finding and in testing certain statements in it assigned as error.

In 1931 there were in existence two corporations in which the testator was interested and in which he owned stock, the Standard Stoker Company and the Peyton–duPont Securities Company. The assets of the securities company consisted of its ownership of a majority of the outstanding stock of the stoker company and interests in various other properties. In 1931 the Peyton corporation was organized under the laws of Delaware and a series of transactions occurred of which, for our purposes, it is only necessary to note certain results. All of the assets of the securities company except the stock in the stoker company were transferred to the Peyton corporation, which assumed all the liabilities of the former; and by agreement with the stockholders of the securities company they delivered 11,900 shares of its stock to the Peyton corporation and received in exchange an equal number of shares of its stock. The authorized capital stock of the securities company

was increased and the additional stock was issued in part to the Peyton corporation and to holders of stock in the stoker company in exchange for that stock; and, as a result, the Peyton corporation became the owner of almost one-half of the stock of the securities company, which owned all the stock of the stoker company. The testator and his wife owned enough of the stock of the Peyton corporation to control that company and, by reason of their and its ownership of stock in the securities company, to control the latter company also. In his will the testator provided for the organization by his executors of another corporation under a written agreement made by him with his wife, a copy of which was attached to the will, but after his death she refused to join in the plan. About seven months after he died, a further change in the corporations was made by which the entire assets of the stoker company were transferred to the securities company; the stoker company was dissolved; the name of the securities company was changed to the Standard Stoker Company; and it thereafter operated the business formerly carried on by the original stoker company. After that time the two corporations with which we are concerned were the second stoker company, which operated the stoker business, and the Peyton corporation, which owned stock in the stoker company, as well as certain other properties. Substantially all of the income of the Peyton corporation came to it through dividends it received from the stoker business.

If Mr. Peyton in his will expressed an intent as to the disposition of the dividends, that intent would control. *Spooner* v. *Phillips,* 62 Conn. 62, 65, 24 A. 524; 12 Fletcher, Corporations (Perm. Ed.) § 5391. The trial court based its decision upon a conclusion

that the will read in the light of surrounding circumstances disclosed an intent that the securities company and the Peyton corporation were to be regarded as mere conduits through which the profits of the stoker business were to pass to the life tenant, except when the demands of reasonable business caution otherwise required, even though under "the conventions and rules of accountancy" a depletion in the capital assets of the Peyton corporation might result. The construction of a will presents a question of law to be determined in the light of facts which are found by the trial court or are undisputed or indisputable. *Spurr's Appeal,* 116 Conn. 108, 111, 163 A. 608.

The only relevant facts and circumstances presented on this record are as follows: For many years before Mr. Peyton's death the development of the stoker business had been the chief concern of his life and he had brought that business to a high state of efficiency. He was a principal party to the reorganization of the corporations in 1931 by which the securities company became owner of all the stock of the stoker company. He was president and a director of the Peyton corporation from its origin until he died. From the accounts with the various companies the management of its interests in which constituted the business of the Peyton corporation, it appears that, except as to the securities company, it was continuously making expenditures in connection with them and getting very little return, and the minutes of the meetings of the directors of the Peyton corporation at which Mr. Peyton was present show that the affairs of these companies were continuously under consideration. He knew that substantially all the income of the Peyton corporation came to it as dividends resulting from the profits of the stoker busi-

ness, and he must have anticipated that this would continue to be so after his death. He disposed of the residue of his estate in a long article in which he provided, as already noted, for the organization of another corporation after his death which, had the plan been carried out, would have given his executors or trustees control of the stoker business. In that article he stated that he proposed to cause to be delivered to his wife before his death a letter in which he would make recommendations as to the way in which she should dispose of the income she would receive, and a letter to his executors in which he would make recommendations as to the disposal of principal and income after her death, and that, while these letters were not to be regarded as derogating from the respective powers of his widow or the executors over the interests given them, he had full confidence that they would carry out his desires. He gave as his reasons for the disposition he made of the residue that the members of his immediate family neither needed nor desired financial benefit from his estate and that he wished to leave the control and direction of the stoker business in the hands of those who had been associated with him in the development of that business, that is, the executors, thus showing his confidence in them and his appreciation of their co-operation.

We can see nothing in these facts taken by themselves which would afford a basis for an inference that Mr. Peyton, in disposing of the income and principal of the residue of his estate, intended to include in the income given to his widow any dividends of the Peyton corporation to which, under the application of established tests, the life tenant would not be entitled.

We cannot determine the rights of the parties upon a conclusion as to the actual intent which Mr. Peyton might have had but must look to the intent he has expressed in his will. *Bronson* v. *Pinney,* 130 Conn. 262, 268, 33 A.2d 322. In the first paragraph of the article disposing of the residue of his estate, Mr. Peyton directed that his executors and trustees should pay over the "net income" to his widow and that, at her death, they should transfer and pay over "the entire principal" to themselves as individuals. The "net income" of a trust estate ordinarily means the amount of income remaining after the payment of the expenses of administration and the making of other expenditures properly chargeable against gross income; *In re Estate of Whitman,* 221 Iowa 1114, 1126, 266 N.W. 28; the "principal" of the trust ordinarily signifies the corpus of the trust property as distinguished from its income. *Levenson* v. *Wolfson,* 42 Ohio App. 332, 333, 182 N.E. 116. These words cannot be construed to include in "net income" any dividends other than those which would be covered by them under established rules of law unless there is something else in the will which would broaden their meaning. *Gray* v. *Hemenway,* 268 Mass. 515, 518, 168 N.E. 102; *Bothwell* v. *Estep,* 166 Wash. 420, 427, 6 P.2d 1108, 12 P.2d 1119.

The trial court relied largely upon two provisions in the will as supporting its conclusion. One reads as follows: "It is further my desire that my said Executors and Trustees, in exercising their control of The Standard Stoker Company, Inc. should endeavor to cause that Company and said controlling corporations, to distribute currently by way of dividends on their stock, all of the earnings of the stoker enterprise, over and above such amounts as may be

retained in the exercise of reasonable business caution as necessary working surplus." To interpret this provision as meaning that Mr. Peyton intended that all dividends received from the stoker business should pass through the Peyton corporation to its stockholders as a mere conduit would necessarily imply that the dividends were to constitute a special fund, that nothing should be charged against them beyond the requirements of reasonable caution in the conduct of the business of that corporation, and that losses and other expenditures were to be charged against its general assets, even though these were substantially depleted or wiped out. Aside from the improbability that Mr. Peyton intended such a result, the provision concerns the management of the corporations as regards dividends to be declared, not the allocation of such dividends as were declared between the life tenant and the remaindermen.

Another provision of the will upon which the trial court somewhat relied is as follows: "I further declare that it is my will that all stock dividends received upon any stocks held by my Executors or Trustees under this Will shall be capital and not income of my estate or of the trust fund in which the stocks upon which such stock dividends are declared are held." It cannot reasonably be inferred from this that the testator intended that all other dividends, even though the money did not come from earnings of the company, were to be regarded as income, because there is nothing in the will or the surrounding facts to indicate any expectation on his part that dividends would be declared by the Peyton corporation except from earnings; and if in his mind he was distinguishing between stock dividends and cash dividends it is unlikely that he was also making

a distinction as to the source from which dividends other than stock dividends would be derived. It is a commentary upon the meaning of this provision that when the will was executed a statute, enacted in 1889, provided that, in such a case as the one before us, all stock dividends should belong to principal, without any provision as to other dividends; Public Acts, 1889, Chap. 72; that this statute was in effect all the time during which the rules as to allocation of dividends between a life tenant and a remainderman which we shall later discuss were being developed: General Statutes, § 4966; and that the statute has been mentioned only twice in our decisions dealing with that matter and in neither instance was it regarded as throwing light upon the question whether cash dividends go to the life tenant or remainderman. *Union & New Haven Trust Co.* v. *Taintor,* 85 Conn. 452, 458, 83 A. 697; *Harding* v. *Staples,* 111 Conn. 325, 334, 149 A. 846; see also 2 Scott, Trusts, p. 1301. Reading the will in the light of the circumstances we have stated, we can find nothing in it to support a conclusion that Mr. Peyton intended that dividends upon the stock of the Peyton corporation should be allocated between the life tenant and remaindermen upon any other basis than that established by the applicable principles of law; see *Boardman* v. *Mansfield,* 79 Conn. 634, 637, 66 A. 169; *Hotchkiss* v. *Brainerd Quarry Co.,* 58 Conn. 120, 134, 19 A. 521; *Hubley's Guardian* v. *Wolfe,* 259 Ky. 574, 580, 82 S.W.2d 830; and we cannot sustain the conclusion of the trial court to the contrary.

That does not, however, settle the issue before us, because the executors claim that, apart from the provisions of Mr. Peyton's will, their allocation of $414,864.73 to themselves as remaindermen must be

sustained. In order to test that contention we turn to a consideration of the financial structure and operations of the corporation. In doing this, we shall look beyond the conventions of accountancy which are discussed at some length in the briefs of the parties to the actual situation as disclosed by the finding and the exhibits made a part of it. "We cannot allow the mere method of keeping the accounts to obscure the realities." *Pardee's Estate,* 343 Pa. 79, 85, 21 A.2d 904; see *Talbot* v. *Milliken,* 221 Mass. 367, 368, 108 N.E. 1060; 12 Fletcher, op. cit., p. 112.

At the time of the transfer of assets from the securities company to the Peyton corporation, the directors of the latter company passed a vote in which it was declared that the consideration received for its stock was at least $575,000, for all purposes for which a valuation should be declared. The journal of the company as of the date of the transfer of the property contains these entries: The items of property transferred by the securities company, with valuations placed upon them to an aggregate amount of $2,070,412.59, were entered with a notation "To record the receipt of the specific assets"; and the liabilities of the securities company were listed to the amount of $380,027.93, "To record" their assumption. Included among the items making up the value of property transferred by the securities company was one entitled "Investments," to the amount of $557,920.48, and the financial statement of the securities company shows that this was the value placed upon stocks and bonds of other corporations owned by it at the time of the transfer; another item was designated "Loans," to the amount of $1,193,141, and the financial statement shows that these loans had all been made to corporations stock in which was

listed among the securities transferred to the Peyton corporation; a third item was designated "Accounts Receivable," to the amount of $290,197.66, which in the financial statement appears, except for two small items amounting in the aggregate to $1037.50, as indebtedness owed by these corporations to the securities company; and, of the total value of $2,070,412.59 placed upon the assets transferred, these three items account for $2,041,259.14. Following the items in the journal above noted was one entitled "Capital Stock, $1,115,384.66," and beneath it a notation, "Loans and Investment Adjustment Reserve," in the same amount; this sum was reached by deducting from the stated value of the assets transferred to the Peyton corporation by the securities company the amount of liabilities assumed and the $575,000 declared in the vote of the directors as the value of the consideration for the issue of its capital stock. The next item was entered as "Investments, $1,502,-900.22," and below that, "Paid In Surplus" to the same amount, with the notation, "To record the receipt of 11,900 shares of capital stock without par value" of the securities company; but nothing in the finding shows, nor do the exhibits attached to it make apparent, the basis upon which this valuation was fixed.[1]

---

[1] The trial court has found that the securities company owned 48,387 shares of stock of the stoker company which were carried on the books of the former at a valuation of $253,187.09, and that in the process of reorganization this interest in the stoker company was taken over by the Peyton corporation, was represented by 11,900 shares of stock of the securities company and was "written up" in value to $1,-502,900.22. As the only assets left in the securities company after the transfer to the Peyton corporation were the stock it owned in the stoker company, the 11,900 shares of the securities company which were outstanding represented that ownership, and the valuation placed on those shares at the time of the transfer did represent in fact an increase in value given to the stoker stock. But the valuation

In the ledger of the Peyton corporation is an account entitled "Loans and Investment Adjustment Reserve" in the amount above noted, $1,115,384.66; prior to and after Mr. Peyton's death in 1936 there were, from time to time, charged against this account losses, called in the journal worthless investments and bad debts. These consisted of items charging off, as worthless or uncollectible, stock in various companies taken over from the securities company, and loans and accounts receivable transferred by it to the Peyton corporation, with additions resulting from further expenditures made by the latter on account of its interests in these corporations, and charges representing an apportionment of rent, salaries and like expenses paid by it on their account. By the end of 1939 the adjustment account was exhausted by these charges. There was also opened in the ledger an account called "Paid In Surplus" in the amount above noted, $1,502,900.22; this account continued substantially intact until the dissolution of the Peyton corporation in 1941; at that time shares of stock in the stoker company which were distributed by the Peyton corporation to its stockholders as a part of the plan of dissolution were entered in the debit side of the account, shares of stock of the Peyton corporation were entered on the credit side, and the balance, $1,029,168.64, was transferred from it, as noted below, to the "Earned Surplus" account. The "Earned Surplus" account was evidently intended to be a statement of the profits and losses from the business of the corporation. References made in it to the journal show that in this ac-

assigned to the stock of the securities company is such as to indicate that it was not merely an arbitrary increase but that it had some basis in other valuations; what this basis is does not appear.

count current receipts were entered upon the credit side and the expenses of the business and expenditures made in the course of it were entered on the debit side. From April 15, 1931, until August 1, 1941, dividends from the operation of the stoker business were paid the Peyton corporation and these were included in the credit items. The latter company declared no dividends until about the end of the year 1936, but it did thereafter declare them until June 4, 1941, the date of the last one, and the payment of these dividends was entered on the debit side. At the time of the dissolution of the Peyton corporation, the debit balance in this account amounted to $1,-029,168.64 and that amount was then transferred from the "Paid In Surplus" account to the "Earned Surplus" account to bring about a balance, as previously stated. It is not found, nor do the exhibits show, that the directors of the company directed that its accounts as stated in this and the preceding paragraph should be set up or handled in this way.

The trial court begins its conclusions with the words: "Although $414,864.75 out of the total of $571,178.31, being the total amount of dividends received by the decedent's executors represents a reduction of capital assets . . . ." This is based on a finding that, of all the dividends paid by the Peyton corporation, $389,402.45 was paid out of earnings or profits and $1,029,168.64 was paid otherwise than out of earnings or profits. This finding is assigned as error by the life tenant. The only evidence supporting it is found in a certain schedule appearing as an exhibit which was made by an accountant from his examination of the books of the company; and, as the particular schedule in question was stated to be based upon the "Earned Surplus" account in the

ledger of the company, its accuracy must necessarily be tested by that account considered in the light of other books of the company. In that account, there is charged upon the debit side certain items generally designated in the journal of the company as "Bad Debts"; these consisted of the following: The value assigned to certain bonds of the Peyton Realty Company taken over from the securities company, and the price paid for other bonds of that company which were purchased from Eugene duPont and Anne Peyton and for which notes were given, later satisfied, except for a payment of $50,000 to the former, by the issuance to them of capital stock of the Peyton corporation; and indebtedness owed to the Peyton corporation by The McIntosh Marello Orchards Company, The Oakland Oil and Gas Company, and The Cardiff or Maryland Marble Company. If the amount of these "bad debts" is deducted there would be left at the dissolution of the company, after the payment of all dividends, but before the amount brought over from the "Paid In Surplus" account was entered, a credit balance of $296,395.06. The items of "Bad Debts" are analyzed in the footnote.[1] Even if there should be charged as

---

[1] The items charged against the account as "Bad Debts" were as follows: One was "To charge off as unrecoverable in part this company's investment of $379,800" in bonds of the Peyton Realty Co.; one was "To charge off as uncollectible all notes and open account indebtedness ascertained as worthless" of the McIntosh Morello Orchards Co., $517,341; one was "To write off as worthless balance of open account" with the Oakland Oil and Gas Co., $3,987.87; and the last was "To write off as bad debt balance of open account" of the Cardiff or Maryland Marble Co., $147,758.64.

When the Peyton corporation took over the assets of the securities company, there were included among them bonds of the Peyton Realty Co. of a stated value of $82,800. The journal, under date of April 30, 1933, contains two items: One was entitled "Investments," followed by the words "Contingent Contract Liability" and explained

debit items in this account the sum of $50,000 paid
Eugene duPont on the note of the corporation which

by the entry: "To set up on the companies books the liability of the
company to purchase from Anne Peyton $148,500 par value" bonds
of the realty company "pursuant to terms of contract" with her
dated April 13, 1931, "and transferred" to the Peyton corporation
"as per agreement dated April 18, 1931," interest to be paid from
July 1, 1931, "to date of repurchase as provided in said agreement";
the other item was in almost the same words except that the person
with whom the agreement was made was Eugene duPont. The
ledger of the Peyton corporation contains an account headed "In-
vestments" and in that account under date of April 30, 1933, these
items are entered as purchases. Journal entries on May 1, 1933,
show the issuance of two notes, each in the sum of $162,112.50, one
to Anne Peyton and the other to Eugene duPont, each of which repre-
sented the principal of $148,500 with the addition of accrued interest.
The cash book under date of March 11, 1936, shows a payment of
$50,000 made to Eugene duPont on account of the note he held.
The journal under date of December 31, 1936, contains an entry in
the sum of $369,437.30, under the heading "Bad Debts" and below
"Investments," with this explanation: "To charge off as unrecover-
able in part this company's investment of $379,800 in $389,000 prin-
cipal amount" of the realty company's bonds, "written down to value
of 1,034.27 shares of common stock of new company to be received
under plan of reorganization" of the company "confirmed on Nov.
17, 1936. See minutes of meeting of Board of Directors held on
December 28, 1936." The amount of $379,800 represented the total
of the bonds taken over from the securities company and those en-
tered on the journal on April 30, 1933. The minutes of the meeting
of December 28, 1936, show that the Peyton Realty Co. was in the
process of reorganization, that a new corporation was to be organized
under the name of 1528 Walnut Street Building Corporation, that,
by reason of the bonds of the realty company owned by the Peyton
corporation and the indebtedness of the realty company to it amount-
ing to $53,163.54, it would receive 1165.02 shares of stock in the new
corporation, and that the value of each share would not be more
than $10, a total of $11,650.20; and the directors voted to write down
the bonds and other debts of the Peyton Realty Co. to that amount.
The journal shows receipt by the Peyton corporation of 1164.9743
shares of stock in the Walnut Street corporation, although the "Dis-
solution Liquidation Account" in its ledger accounts for the distribu-
tion of only 1134.9743 shares, given the value above stated, $11,650.20.
Under date of December 1, 1937, the journal contains two entries.
One recorded the issuance of shares of capital stock of the Peyton
corporation to Eugene duPont in settlement of a note for $75,000,

he held and the increase in accounts owed the Peyton
corporation by the companies whose indebtedness

the principal of which, $125,000, had been reduced in 1936 "by pay-
ment of '$50,000' in accordance with agreement dated December 4,
1937, approved by directors at meeting held November 26, 1937";
and this note apparently represented the balance of the note orig-
inally given him of May 1, 1933. The other entry recorded an issue
of shares of the capital stock of the corporation to Anne Peyton in
settlement of four notes of which one was the note for $162,112.50
issued to her on May 1, 1933. The minutes of the meeting of the
board of directors held on November 26, 1937, show that the stock
was issued to them upon the basis of a value of $77.50 placed on each
share, and with small additions paid in cash this represents an in-
debtedness at that time to Anne Peyton to the amount of $216.826.52
and to Eugene duPont to the amount of $131,990.86. The agreements
referred to in these entries are not before us.

Among the assets taken over by the Peyton corporation from the
securities company were "Loans" due the latter from the McIntosh
Morello Orchards Co. to a stated amount of $517,341, and "Accounts
Receivable" due the securities company from the orchards company
to a stated amount of $163,389.03. The account of the Peyton cor-
poration with the orchards company appearing in the ledger of the
former shows that the latter indebtedness was increased by $51,172.44,
making the total $214,561.47. Under date of December 31, 1936, the
journal contains an entry, "Bad Debts," $731,902.47, made up of two
items, "Accounts Receivable," $214,561.47, and "Loans and Notes Re-
ceivable," $517,341, with this explanation: "To charge off as un-
collectible all notes and open account indebtedness" of the orchards
company, "ascertained as worthless during 1936. See minutes of
meeting of directors held on December 28, 1936." The minutes of
that meeting contain a note that all notes and open account indebted-
ness of the company were to be charged off as worthless.

Among the assets taken over by the Peyton corporation from the
securities company were "Accounts Receivable" due the latter from
the Oakland Oil & Gas Co. to the stated amount of $25,376.49. In
the Peyton corporation ledger account with the oil company that
amount was increased by $19,855, making the total $45,231.49. Under
date of December 31, 1938, there appears in the journal an item, under
the heading "Loans & Investment Adjustment Reserve" followed by
"Accounts Receivable," in the amount of $30,831.49, with this ex-
planation: "To write off balance of advances and charges to" the oil
company "determined to be worthless," $45,231.49, "and, after apply-
ing cash on hand to this balance, about $30,831.49 will be paid and
is written off as a bad debt." The ledger account, "Loans & Invest-
ment Adjustment Reserve," shows that this amount was charged

was charged off, there would still be a balance in the "Earned Surplus" account to the amount of about $130,000. It also appears from this account, checked against the journal entries, that the Peyton corporation received dividends to a total amount of $2,068,-544.25 from the stoker business and paid dividends to its stockholders only to an aggregate amount of $1,418,571.09.

When the Peyton corporation was dissolved, it still owned the stock of the stoker company. Despite the transfer of $1,029,168.64 from the "Paid In Surplus" account, the "Liquidation Account" in the ledger, in accordance with entries in the journal, carries the shares of stock in the stoker business at $1,502,900.22, and the journal shows a corresponding value of $10.35 placed upon each share. The trial court has found that the executors, upon the distribution of stock to them, sold 6617 shares of the stoker company stock at a price just under $17 a share, and

against that account. Under date of December 31, 1939, the journal contains another entry: "Bad Debts" followed by "Accounts Receivable," $3,987.87, with this explanation: "To write off as worthless balance of open account" of the oil company, with further details showing that the amount of $30,831.49 was determined on the assumption that $14,400 would be received on the "final liquidation" of the oil company, whereas in fact only $10,412.13 was received; "therefore balance of $3,987.87 is worthless and a bad debt."

When the Peyton corporation took over the assets of the securities company, there were due the latter from the Cardiff Green Marble Co., later in the books called the Maryland Marble Co., "Accounts Receivable" to the stated amount of $43,112.91. The account of the Peyton corporation with this company shows that this amount was increased by $112,520.03, making the total $155,632.94. Under date of December 31, 1939, there is an entry in the journal, under the heading "Bad Debts" followed by "Accounts Receivable," of $147,-758.64, with the explanation: "To write off as a bad debt balance of open account" of the Maryland Marble Co., with further statements showing that this amount was reached by deducting from the final balance due from the company $7,874.30, "paid on a/c from proceeds of sale as final dividend in liquidation."

this is sufficient support for its further finding that the actual value of the stock of that company held by the Peyton corporation was about $2,450,000.

The issuance of stock to Anne Peyton and Eugene duPont in satisfaction of the indebtedness owed by the Peyton corporation to them did not result in any expenditure by it; see *Mills* v. *Britton,* 64 Conn. 4, 21, 29 A. 231; *Boardman* v. *Mansfield,* 79 Conn. 634, 640, 66 A. 169; *Eisner* v. *Macomber,* 252 U.S. 189, 210, 40 S. Ct. 189, 64 L. Ed. 521; and it altered its financial condition only to the extent, it may be, of increasing its fixed capital by the amount of the indebtedness discharged by the issue of the stock. Del. Rev. Code (1935), Chap. 65, § 2046, p. 466. The charging off of its investment in the bonds of the realty company represented no more than a decrease in the value of its general assets. The latter is also true of the charging off of most of the indebtedness owed the Peyton corporation by the McIntosh, Oakland and Cardiff companies. With the exception of expenditures actually made for these companies, these items did not represent losses incurred in the conduct of the business. It does not appear that they were entered on the debit side of the "Earned Surplus" account by vote of the directors of the corporation. Under the laws of Delaware they were under no legal obligation to regard these amounts in determining whether there were profits from which they would declare dividends. See Ballantine, Corporations (Rev. Ed.) p. 590. Upon the basis of our examination of the books we cannot sustain the finding of the trial court that, of the total amount of dividends of the Peyton corporation received by the executors, $414,864.73 was declared by it other than out of earnings or profits.

The over-all picture of the financial structure and operations of the Peyton corporation is this: Most of the valuations placed upon its assets on its books did not represent actual values and the books do not show at any time the actual financial condition of the company. The transfer of $1,029,168.64 from the "Paid In Surplus" account to the "Earned Surplus" account at the time the corporation was dissolved represented merely a book entry made to bring into balance the latter account. The amount of "at least $575,000" declared by the directors to be the capital upon which its stock was issued was based upon the value of the assets transferred to it at its organization by the securities company, but with some minor exceptions those assets ultimately proved to be of no value and were charged off as worthless. The "Paid In Surplus" was based upon the value assigned at the organization of the corporation to the stock of the securities company transferred by its owners to the Peyton corporation in exchange for the shares of the latter issued to them; but those shares of stock did not in themselves constitute that surplus; and they were and continued to be a part of the working capital of the company.

The executors cite certain cases holding that persons entitled to the principal of a fund have a right to the benefit of any increase in value of the property constituting it; *Boardman* v. *Mansfield,* supra, 637; *Carpenter* v. *Perkins,* 83 Conn. 11, 20, 74 A. 1062; but that principle does not support a conclusion that if in this case the stock of the securities company increased in value the "Paid In Surplus" would be thereby increased. The management of the assets received from the securities company and the stock received from its stockholders constituted

the business of the Peyton corporation. The corporation could not properly pay dividends which would decrease its net assets below the amount of its fixed capital; *Bishop* v. *Bishop*, 81 Conn. 509, 528, 71 A. 583; *Union & New Haven Trust Co.* v. *Taintor*, 85 Conn. 452, 457, 83 A. 697; but the executors do not claim that the declaration of dividends in this case had that result. One of the legitimate uses of a paid-in surplus is to discharge liabilities which the directors expected to meet from the current operations of the company but which it is found impossible or inexpedient to pay in that way; and for that reason, in determining whether such a surplus continues intact, such liabilities do not need to be considered. Upon the case as it has been presented to us by the executors, and upon the basis of the examination of the financial affairs of the corporation summarized above, we cannot conclude that the payment of the dividends resulted in a depletion of the "Paid In Surplus."

We would hesitate finally to determine the rights of the parties upon that examination. That the corporation could, under the laws of Delaware, lawfully declare dividends out of any funds it owned so long as its fixed capital was not impaired is not questioned; see Del. Rev. Code (1935), Chap. 65, § 2066, p. 474; and, in the situation before us, our law determines whether the dividends received by the executors should go to the life tenant or remaindermen. *Willis* v. *Hendry*, 127 Conn. 653, 675, 20 A.2d 375; 2 Beale, Conflict of Laws, p. 1024. In *Smith* v. *Dana*, 77 Conn. 543, 60 A. 117, this court, speaking by *Prentice, J.*, after a careful examination of the question, reached a conclusion which is succinctly stated in the later case of *Bishop* v. *Bishop*, supra,

527, as follows: "The general rule, subject, perhaps, to possible exceptions, is that persons having a right to the income of trust funds invested in stocks are entitled to the enjoyment of those dividends declared by the directors of the respective corporations which partake of the character of cash dividends, not including, however, those which may be so declared in the process of liquidation or reduction of capital, and that their rights are limited to such dividends. *Smith* v. *Dana,* [supra, 548, 556, 557]; *Boardman* v. *Mansfield,* [supra, 637]. Cash dividends, as that term is applied in this connection, include all distributions of the surplus assets of a corporation, whether the same be in the form of cash or property, which are made to shareholders pro rata through the medium of dividend declarations in such manner that the assets so distributed are aparted from the body of the assets of the corporation to become the property of the shareholders, and thus pass out of the dominion and control of the corporation into that of the shareowners. *Boardman* v. *Mansfield,* [supra, 639]; *Green* v. *Bissell,* 79 Conn. 547, 552, 65 Atl. 1056." See also *Union & New Haven Trust Co.* v. *Taintor,* supra, 455; *Union & New Haven Trust Co.* v. *Sherwood,* 110 Conn. 150, 163, 147 A. 562; *Harding* v. *Staples,* 111 Conn. 325, 329, 149 A. 846.

In *Smith* v. *Dana,* supra, it was noted that there was a sharp conflict in the decisions as to the proper rule by which to determine the respective rights of life tenants and remaindermen, and that conflict has continued. Professor Scott states that the recent trend of decisions has been in favor of the conclusion reached by this court, commonly called the Massachusetts rule; 2 Scott, Trusts, p. 1300; his

statement may be open to question; see 12 Fletcher, Corporations, p. 48; but at least there has been no such preponderating weight of judicial opinion opposing the rule as to lead us to question our adherence to it. Many trusts have probably been established in reliance upon it and many, no doubt, have been and still are being administered under it; it has become a rule of property; *In re Joy's Estate,* 247 Mich. 418, 433, 225 N.W. 878; *Crozer's Estate,* 336 Pa. 266, 271, 9 A.2d 535; and it should be maintained unless there are most compelling reasons to the contrary. Indeed, as to trusts created after July 1, 1939, the rule in broad terms has been established by statute. General Statutes, Cum. Sup. 1939, § 1295e.

The executors do not expressly claim that we should change the rule as regards the trust before us but seek to take the situation out of it. They do not contend that the payment of dividends at all impaired the fixed capital of the corporation and their position reduces itself to a contention that, in part at least, that payment transferred to stockholders money forming a portion of its "Paid In Surplus." That surplus represented the value of certain property acquired at the organization of the corporation which, with the actual or presumed knowledge of the directors, was set apart as a special fund. The directors might, no doubt, at any time have made the money included in this account a part of the working capital of the corporation, and then it would have had the same character as other assets employed in the conduct of its business; or they might have distributed it among the stockholders through the medium of dividends. *People of Colorado* v. *Great Western Sugar Co.,* 29 F.2d 810, 813; *Randall* v.

*Bailey,* 288 N.Y. 280, 290, 43 N.E.2d 43. The corporation issued no preferred stock and, so long as the money remained in the account, we must consider the intent of the directors to have been that it should be a special fund to be retained to bolster the financial condition of the company and to be used only when unexpected contingencies should arise in the course of its business. See *Willcutts* v. *Milton Dairy Co.,* 275 U.S. 215, 218, 48 S. Ct. 71, 72 L. Ed. 247; *Leather Mfrs.' National Bank* v. *Treat,* 128 F. 262, 264, 62 C.C.A. 644; *Chicago Title & Trust Co.* v. *Central Trust Co.,* 312 Ill. 396, 411, 144 N.E. 165; *Sarles* v. *Scandinavian American Bank & Northwestern Trust Co.,* 33 N.D. 40, 47, 156 N.W. 556. Under the rule established by our decisions, where money or property paid or delivered to the stockholders of a corporation constitutes a complete or partial liquidation of its capital, whether or not called a dividend, it increases the principal of an estate and goes to the remaindermen. *Second Universalist Church* v. *Colegrove,* 74 Conn. 79, 49 A. 902; *Bulkeley* v. *Worthington Ecclesiastical Society,* 78 Conn. 526, 63 A. 351. Whether, if it clearly appeared that a dividend was paid from such a fund as the "Paid In Surplus" in this case, the situation would fall within that principle, we have never been called upon to determine. In *Boardman* v. *Boardman,* 78 Conn. 451, 62 A. 339, we were dealing with the respective rights of a life tenant and remaindermen as regards dividends paid by two banks; in each case, previous to the declaration of the dividends, the bank declaring them had taken over another bank, and as a result the former had a surplus, in one case in an amount determined by the agreement of merger; we stated (p. 456) the rule that when

any part of the capital was paid to stockholders, though the payment took the form of a cash dividend, it became a part of the principal; and in holding that the life tenant was entitled to the dividends we pointed out that this payment left an unimpaired capital and net surplus; but we had no occasion to determine whether, had it clearly appeared that the source of the dividends was the surplus agreed to be retained, they would have been regarded as a distribution of capital. Counsel for the executors cite certain statements from the opinions in the cases we have referred to in support of their rights as remaindermen, but those statements are to be read in the light of the particular situations before the court and are inconclusive upon the issue before us.

As this case is presented to us we are not called upon to determine whether, if it clearly appeared that in order to pay the dividends as declared money would have to be taken from the "Paid In Surplus," they would to that extent represent a distribution of capital assets of the corporation which should go to the remaindermen. While the earlier votes of the directors in which dividends were declared spoke of them as "cash dividends," each was called, beginning with the vote adopted on December 22, 1939, a "cash dividend or distribution"; but this description falls far short of evincing an intent to pass on to the stockholders any part of the "Paid In Surplus" of the company. We would, moreover, be under a duty, in any event, to look behind the words used to the real nature of the distributions made; *Harding* v. *Staples*, supra, 329; *Ex parte Humbird*, 114 Md. 627, 634, 80 A. 209; and our study of the books of the corporation makes it clear that the directors had no specific intent to distribute any part of that surplus.

The rule adopted in *Smith* v. *Dana,* supra, had its basis principally in two considerations: the difficulty and often impossibility of tracing money paid in dividends to its ultimate source, particularly in view of the wide discretion given directors as to the uses to be made of corporate property and funds, and the need of a simple workable rule for the guidance of persons who wished to create trusts with provisions for life uses and remainder over, and of the trustees called upon to administer such trusts; see *In re Joy's Estate,* supra; and we have recognized that the rule will probably in particular situations fall short of accomplishing exact justice or doing full equity. *Boardman* v. *Boardman,* supra, 455. Upon the case as presented to us, a conclusion that any part of the dividends was paid from the "Paid In Surplus" could, at most, be reached only by an extended and by no means simple examination into and review of the financial affairs of the corporation, an examination not required under the rule announced in *Smith* v. *Dana,* supra.

To summarize our conclusions: We cannot agree with the basis upon which the trial court decided the case, that is, that the will evidenced an intent on Mr. Peyton's part that all dividends received from the stoker business should be paid to the life tenant; we cannot sustain the finding that dividends to the amount of $414,864.73 were paid otherwise than out of earnings. We must, therefore, remand the case for a new trial. Upon that trial, the question whether dividends paid by the corporation resulted in a distribution of fixed capital or paid-in surplus should be determined by the application of the rule adopted in *Smith* v. *Dana,* supra, and followed in the subsequent cases we have cited; and we leave un-

determined the question whether, if it should be found that they were in whole or in part a distribution of the "Paid In Surplus" of the corporation, they or the portion distributed from that surplus should go to the life tenant or be allocated to the remaindermen.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.