FIRST WYOMING BANK, N.A.–CHEY-ENNE, as Successor Trustee of the Trust under the Last Will and Testament of Charles W. Burdick, Deceased, Appellant (Plaintiff),

v.

The FIRST NATIONAL BANK AND TRUST COMPANY OF WYOMING, as Executor of the Estate of Margaret Burdick Hewlett, Appellee (Defendant),

v.

Horace W. HEWLETT, Appellee (Intervenor-Defendant).

Margaret Truesdall AYERS, Jane Truesdall Jones, James Truesdall, Katherine Truesdall Crampton, and Burdick Truesdall, Appellants (Intervenors),

v.

The FIRST NATIONAL BANK AND TRUST COMPANY OF WYOMING, as Executor of the Estate of Margaret Burdick Hewlett, Appellee (Defendant),

v.

Horace W. HEWLETT, Appellee (Intervenor-Defendant).

Nos. 5319, 5320.

Supreme Court of Wyoming.

June 2, 1981.

Rehearings Denied July 2, 1981.

**1356**

Walter C. Urbigkit, Jr. of Urbigkit & Whitehead, P. C. and Roy Stoddard, Jr., Cheyenne, signed the briefs of First Wyoming Bank, N.A.–Cheyenne. Messrs. Urbigkit and Stoddard appeared in oral argument.

Nick Kalokathis of Lathrop & Uchner, P. C., Cheyenne, signed the brief of First Nat. Bank and Trust Co.; and Carl L. Lathrop appeared in oral argument.

Houston G. Williams of Williams, Porter, Day & Neville, P. C., Casper, signed the brief of Mr. Hewlett and appeared in oral argument.

E. Byron Hirst, Glenn Parker, and Thomas Long of Hirst & Applegate, Cheyenne, signed the brief of Margaret Truesdall Ayers et al. Messrs. Hirst, Parker and Long appeared in oral argument.

Before ROSE, C. J.*, McCLINTOCK **, RAPER ***, and THOMAS, JJ., and RANCK, D. J.

RAPER, Justice.

This litigation represents an attempt by the remaindermen of a trust to charge the estate of the life beneficiary-trustee for her allegedly wrongful appropriations of trust property. The value of their claims total in excess of five million dollars. The district court found for them on only one claim to the extent of $463,395 plus interest thereon in the amount of $109,043.86. They challenge on appeal the part of the district court's ruling that denied their remaining three claims. The questions presented as to each of these claims were stated best by the successor trustee of the trust under the last will and testament of Charles W. Burdick (First Wyoming Bank) as follows:

"A. *The Standard Oil Company of Indiana Capital Stock Issues.*

"1. Did the 6,000 shares of Standard of Indiana capital stock, issued by said company as a divided, March 15, 1929, on the 12,000 shares of Standard of Indiana stock owned by Margaret Burdick Hewlett as Trustee of the Charles W. Burdick inter-vivos trust, constitute income * * * to said trust?

"2. Did the Wyoming Probate Court, in the administration of the Estate of Charles W. Burdick, have or acquire jurisdiction to determine the ownership, on May 14, 1930, of the 6,000 shares of Standard of Indiana capital stock then owned by and registered to Margaret Burdick

* Chief Justice since January 5, 1981.

** Retired March 26, 1981, but continued to participate in the decision of the court in this case

pursuant to order of the court entered March 30, 1981.

*** Chief Justice at time of oral argument.

Hewlett as Trustee of the Charles W. Burdick inter-vivos trust?

"3. Did the U. S. District Court for the District of Wyoming, in 1932, have jurisdiction as to the thirteen remaindermen of the Charles W. Burdick Trust to determine the true ownership of the 6,000 shares of Standard of Indiana stock, and to determine the validity of the Decree of the Probate Court entered May 14, 1930 in the Estate of Charles W. Burdick?

"4. Are the now claims to said stock and its increase, made by successor trustee of the Charles W. Burdick Trust, on behalf of the now vested thirteen remaindermen thereof, barred by Statutes of Limitations or laches?

"B. *The Standard Oil Company of New Jersey Stock Issues.*

"1. Did Wyoming common law during the years 1948 to 1963, inclusive, follow the doctrines of the 'Massachusetts Rule' as to allocation of stock dividends on corporate stock as between principal and income receipts of a Wyoming trust, with specific reference to the particular doctrine under the 'Massachusetts Rule' as enunciated in the case of *Wehrhane v. Peyton,* 52 A.2d 711 (at p. 723), 133 Conn. 478 (1947)?

"2. Did the transactions of Standard Oil Company of Indiana, in exchanging its foreign properties for capital stock of Standard Oil Company of New Jersey in 1932 and 1933, in distributing most of these shares as dividends to Standard Oil Company of Indiana stockholders during the period 1948 to 1963, and in exchanging the remainder of said shares for shares of stock of Standard Oil Company of Indiana, and receiving said latter shares as treasury stock and treating same as an offsetting entry to stockholders' capital accounts, amount to a 'partial liquidation' of Standard Oil Company of Indiana within the rule of *Wehrhane v. Peyton,* supra?

"C. *The Oil Royalties Issues.*

"1. Did Wyoming common law, prior to 1963, require a trustee-life beneficiary to make an equitable allocation of oil royalties received by a trust as between income and corpus?

"2. Did the Revised Uniform Principal and Income Act, as enacted in Wyoming in 1963, apply as to oil royalties received by a trustee-life beneficiary from and after its effective date?

"3. If the Wyoming Revised Uniform Principal and Income Act did apply as to oil royalties received by a trustee-life beneficiary from and after its effective date, did it mandate that a trustee-life beneficiary be permitted with impunity to continue an illegal failure to allocate said royalties as between income and corpus?"

All of the questions presented as to the first claim must be answered no in order for appellant to prevail; those presented under each of the other two claims must all be answered yes for appellant to be entitled to a reversal as to those claims.

We will affirm.

## BACKGROUND—APPELLANTS' CLAIM OF THE STANDARD OIL OF INDIANA STOCK

Charles W. Burdick, a successful lawyer and businessman in Cheyenne, executed his last will and testament on May 7, 1919. It provided in part:

"I, Charles W. Burdick of Cheyenne Wyoming declare this to be my last will disposing of my property as follows:—

"*First:*—I hereby appoint my daughter Margaret Fuller Burdick and Blanche O. Lummis of Cheyenne, Wyo. joint trustees of my estate and no bond shall be required of them. They or the survivor of them shall continue to act during life, and the trust hereby created shall continue during the life of such survivor and as long thereafter as may be herein specified. My said trustees shall receive the following annual compensation: to-wit:— there shall be paid to my said daughter as her compensation the sum of Five Thousand dollars, payable in monthly installments if practicable, and thereafter to the said Blanche O. Lummis the sum of twenty-five hundred dollars, payable in monthly installments if practicable.

"*Second.* I give and devise all my property of every kind to my said daughter

Margaret F. Burdick and to the said Blanche O. Lummis as joint trustees, in trust during their lives and during the life of the survivor of them on the conditions and for the purposes hereinafter set forth."

It should be observed that in the first paragraph that Margaret Burdick and Blanche Lummis were appointed joint trustees of the estate, and then in the second paragraph the testator's property was devised to them as joint trustees. The question then arises did the testator confuse the term "trustee." This will be discussed in detail later in the opinion.

On November 24, 1919, and six months after executing his will, Mr. Burdick entered into a trust agreement, the provisions of which provided that Mr. Burdick convey in trust "twenty four hundred (2,400) shares of capital stock of Midwest Refining Company" to Blanche Lummis as trustee. She would "collect and receive the income thereof, and * * * apply the entire net income to the use of the grantor during the term of his natural life. * * * " Upon Mr. Burdick's death, the trust would terminate and the stock would be delivered to the "trustees of the estate."

Later on March 1, 1920, Mr. Burdick amended the trust agreement to provide that Margaret Burdick Hewlett (his newly married daughter) would succeed Blanche Lummis as trustee in the event of her death. It was further provided that if necessary, the New York Trust Company of New York City would succeed Margaret Burdick Hewlett as trustee. Upon the death of Blanche Lummis in October, 1923, Margaret Burdick Hewlett succeeded her as trustee pursuant to the amendment of the trust agreement.

During the life of the inter-vivos trust, Midwest Refining Company merged with Standard Oil Company of Indiana. As a result, the 2,400 shares of capital stock in Midwest Refining—the principal item of the trust's corpus—became 12,000 shares of capital stock in Standard Oil.

Mr. Burdick prior to his death executed two codicils to his will. The first codicil, dated November 20, 1925, followed his marriage to Mary McCalman and announced that his intentions embodied in the will had not been substantially altered by his change in marital status. The codicil merely provided that a trust be set up such that a net annual income of $5,500 would inure to the benefit of his wife for the remainder of her life. It should be observed that this command was directed to "the Executors & Trustees named in my said will." However, after the one reference to executors, the remainder of the codicil used the term "trustees."

The second codicil, dated December 31, 1926, was executed a mere nine days before Mr. Burdick's death. It substituted the name George Hewlett (testator's son-in-law) for Blanche Lummis' in order that he may act "as a trustee."

After Mr. Burdick's death on January 8, 1927, a petition for probate was filed. It requested that George Hewlett and Margaret Burdick (Hewlett) "be granted letters testamentary," since they were named as executors in the will. On February 14, 1927, they were officially appointed as executors of the estate. However, the final account and the petition for distribution could not be completed by the executors until over three years later on April 30, 1930.

In the meantime, a 6,000-share dividend was declared on the 12,000 shares of Standard Oil of Indiana in Mr. Burdick's estate. The petition for distribution discussed this occurrence as follows:

"9. The inventory and appraisement of said estate included an item of 12,000 shares of stock of the Standard Oil Company, an Indiana corporation, which stock had been issued to Margaret Burdick Hewlett, Trustee, pursuant to a trust instrument * * *:

*     *     *     *     *     *

"The 2400 shares of stock of the Midwest Refining Company mentioned in said instrument, by exchange and additions thereafter became 12,000 shares of stock of the Standard Oil Company, an Indiana corporation. On or about March 15, 1929, the said Standard Oil Company

declared and paid a stock dividend of 50% thereon, aggregating a dividend of 6,000 shares of stock of the said Standard Oil Company. Said 6,000 shares of stock were issued to Margaret B. Hewlett, Trustee, and are now held by said trustee, and have never been distributed to the beneficiary of the income of said estate, the said Margaret Burdick Hewlett."

The executors then prayed that:

" * * * upon hearing had hereing [sic] it be adjudged and decreed by this Court:

"1. That the final account and report of these executors be allowed and approved.

"2. That George W. Hewlett and Margaret B. Hewlett be appointed and confirmed as testamentary trustees of said estate and directed to file their acceptance thereof and declaration of trust in this court with their official oath.

"3. That all accrued income from said estate in the hands of the executors, including the 6,000 shares in stock dividends issued by Standard Oil Corporation, an Indiana corporation, to Margaret B. Hewlett, trustee, be distributed to, transferred and paid over to Margaret B. Hewlett, daughter of decedent.

"4. That all capital assets of said estate in the hands of the executors be distributed to George W. Hewlett and Margaret B. Hewlett, as testamentary trustees.

"5. That the 12,000 shares of stock of the Standard Oil Company, an Indiana corporation, heretofore issued to Margaret B. Hewlett, trustee, under the trust instrument set forth in this report, be transferred and delivered to George W. Hewlett and Margaret B. Hewlett, testamentary trustees."

It is important to note that having previously been appointed as guardian ad litem for the residuary legatees who were either minors or nonresidents of Wyoming, William Mullen sent them the following notice on May 2, 1930, two days after the filing of the petition for distribution:

"WILLIAM E. MULLEN

"Attorney at Law

"406–407 Hynds Building,

"Cheyenne, Wyoming.

"May 2, 1930.

"The suit brought against the executors of the Burdick Estate and others by the Receiver of The First National Bank of Cheyenne, Wyoming, to recover $1,340,846.47, upon an alleged directors' liability, was settled by the executors before going to trial as to said estate, for $220,000.00, which settlement was authorized and approved by the court. As the estate is now ready for settlement, and distribution, the executors filed their final account, report and petition for distribution of said estate in the District Court of Laramie County, Wyoming, on April 30, 1930.

"The petition prays that the capital assets of the estate be distributed to the testamentary trustees, and that all income, including interest, cash and stock dividends from the estate property to paid to Margaret B. Hewlett, the beneficiary named in decedent's will. The account and petition is open to objections on the part of anyone interested in the estate until May 10, 1930, and if no objections are filed, it will be presented to the Court for allowance and decree as soon thereafter as the matter can be heard.

"I was appointed attorney for non-resident residuary legatees and guardian ad litem for minor non-resident residuary legatees, named in decedent's will, by the District Court sitting in probate, on July 8, 1927, and for that reason, feel that it is my duty to notify you as one of the residuary legatees, of all important steps taken in the administration of said estate, in order that you may make objections, if you desire.

"Very truly yours,
"WILLIAM E. MULLEN." [1]

---

1. Appellants attack Mullen's conduct as constituting fraud, and enabling a collateral attack on the probate proceedings. In order to constitute the fraud which opens up a decision to collater-

On May 14, 1930, the probate court entered a decree providing in part:

"The above matter came on for hearing upon the final account, report and petition for distribution of the residue of said estate filed herein, on April 30, 1930, by George W. Hewlett and Margaret B. Hewlett, as executors of said estate, and also upon the supplemental report now filed by said executors covering transactions since the filing of their final report, and it appearing to the Court that notice of the filing of said final report, account and petition for distribution was duly published, as required by law, and that proof of such publication has been filed in this Court, and the executors now being present in person, and by their counsel, A. C. Campbell, Esq., and the non-resident residuary legatees, named in decedent's will being now represented by William E. Mullen, Esq., and Margaret B. Hewlett, sole heir and life beneficiary, named in the will of decedent, being now represented by Wilfrid O'Leary, Esq., and it appearing to the Court that no objections have been filed to said final report, account or petition for distribution, and no person or persons, having appeared to except, or object to said final account, report, or petition for distribution, and the Court having examined said account, report and petition for distribution, and heard all of the evidence offered by the parties interested in said estate, finds:

\* \* \* \* \* \*

"3. The Court further finds that under the trust agreement referred to in said final account and report, 12,000 shares of the capital stock of Standard Oil Company, an Indiana corporation, were issued to Margaret B. Hewlett, trustee, under Certificates numbered D–18944; D–18945 and D–18946 _____, and that thereafter and on or about the 15th day of March, 1929, 6,000 shares of the capital stock of said Standard Oil Company, an Indiana corporation, were issued as a stock dividend upon said original 12,000 shares, under Certificate No. j–26957, to Margaret B. Hewlett, trustee. The Court further finds that under said trust agreement, and pursuant to the terms thereof, said original 12,000 shares of the capital stock of the Standard Oil Company, an Indiana corporation, should be transferred and delivered by said trustee to George W. Hewlett and Margaret B. Hewlett as testamentary trustees named in the will of decedent; that under the terms of decedent's will, Margaret B. Hewlett, daughter of decedent, is entitled to receive all net income from the property of said estate, during the period of her natural life, and that said 6,000 shares, issued as a stock dividend by the Standard Oil Company, an Indiana corporation, should be distributed, transferred and delivered by Margaret B. Hewlett, trustee as aforesaid to Margaret B. Hewlett as life beneficiary under decedent's will as a portion of the net income from said estate passing to her under the will of her father Charles W. Burdick.

\* \* \* \* \* \*

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court:

"1. That the final account and report and supplementary account and report of said executors filed herein as aforesaid, be and the same are hereby settled, allowed and approved.

"2. That George W. Hewlett and Margaret B. Hewlett, be and they are hereby appointed and confirmed as testamentary trustees of said estate as directed by the will of decedent, to serve without bond, and they are hereby directed to file herein their written declaration, acceptance and oath as such trustees.

\* \* \* \* \* \*

"4. That Margaret B. Hewlett, trustee named in the trust agreement hereinbefore referred to, assign, transfer and set over to George W. Hewlett and Margaret B. Hewlett, testamentary trustees, the

---

al attack, there must have been a concealment of facts from the court. *Selway v. Burns*, 1967, 150 Mont. 1, 429 P.2d 640. Here no facts were concealed from the court. Appellants' allega-tion sounds more in malpractice. If Mullen was double dealing then appellants' claim lies against him.

12,000 shares of the capital stock of Standard Oil Company, an Indiana Corporation, heretofore issued to her as trustee; and described in Certificates Nos. D–18945 [,] D–18944 and D–18946; that Margaret B. Hewlett, trustee, assign, transfer and set over and deliver to herself as sole life beneficiary under the will of the decedent, as income from the property of said estate, the 6,000 shares of stock issued to her as such trustee as a stock dividend by Standard Oil Company, an Indiana Corporation, described in Certificate Numbered J–26957; and take receipt therefor; * * * "

In 1932 when Standard Oil refused to reissue the 6,000 shares of stock in Margaret Burdick Hewlett's name, she brought suit in the United States District Court for the District of Wyoming. The court concluded that Standard Oil had to comply with Margaret Hewlett's demand because the matter had been decided by the probate court's order. The federal court noted the following in reaching its determination:

"As conclusions of law, the Court finds:

"1. Said trust agreement executed by Charles W. Burdick on November 24, 1919, as amended by him on March 1, 1920, is clear in terms, and shows such an unequivocal intent on the part of the makers that it should terminate upon his death and that the property included therein should then pass out of said trust and become the property of the estate of said Charles W. Burdick, that no construction of said instrument by a court of equity is or was required.

"2. Said trust agreement executed by Charles W. Burdick on November 24, 1919, and the amendment thereof executed by him on March 1, 1920, terminated upon his death on January 9, 1927, and the title of the property that had been included therein passed out of the trust at once to his estate and into the possession of his executors for administration. The stock dividend shares issued thereon about two years later during the administration of his estate also became the property of the estate of said Charles W.

Burdick, subject to administration by the District Court sitting in probate, as an incident of the primary holding.

* * * * * *

"4. The District Court of Laramie County, Wyoming, sitting in probate, acquired and had jurisdiction of the estate of Charles W. Burdick, deceased, and of all parties interested in said estate, admitted his will to probate and had full power and right to administer and settle the affairs thereof, allow and require the payment of claims and expenses, determine the net income payable to beneficiaries named therein, construe the terms of his will and codicils, and decree distribution of said estate to the persons entitled thereto in accordance with the terms of the will.

"5. The District Court of Laramie County, Wyoming, sitting in probate, having after statutory notice, rendered its decree of settlement and distribution of the estate of Charles W. Burdick, in the exercise of its lawful jurisdiction, no conflicting interests appearing or objecting, had power to determine what portion of said estate was corpus, and what was income, and having decided said questions, its decision is binding upon all persons interested in the estate, and upon all the world.

"6. The order and decree of distribution rendered by the District Court of Laramie County, Wyoming, in probate, in the matter of the estate of Charles W. Burdick, deceased on May 14, 1930, followed the method of procedure provided by statute and bound all parties interested therein, and being unmodified, unchanged and not appealed from, is final and conclusive and not subject to collateral attack."

No challenge was ever made to Margaret Hewlett's receipt of this property until after her death in 1976. It is from the district court's denial of that challenge that this appeal arises.

## HOLDING—APPELLANTS' CLAIM OF STANDARD OIL OF INDIANA STOCK

■ It is well established in this state that a district court's jurisdiction over probate matters is separate and distinct from its general jurisdiction.[2] In effect, the district court judge must wear two hats—one when sitting as a court of general jurisdiction; one when functioning as a court with exclusive jurisdiction of the probate of an estate. But, it is also clear that the judge may not wear the hats simultaneously. *Matter of Estate of Frederick,* Wyo. 1979, 599 P.2d 550. Thus, when a court is operating as one in probate, its jurisdiction is limited and special; it may only consider matters relating to the distribution and settlements of estates. If it decides issues unnecessary to accomplish those ends, then its determinations will be entitled to no binding res adjudicata effect and may be collaterally attacked. *Church v. Quiner,* 1924, 31 Wyo. 222, 224 P. 1073. Here, appellants contend that the probate court's decision in 1930 awarding Margaret Hewlett free title to the 6,000 shares of dividend in Standard Oil of Indiana exceeded the court's probate jurisdiction. We, like the federal court sitting in 1932, do not agree.

■ District courts are entitled to the presumption of regularity when exercising their general jurisdiction. This presumption applies with equal force to proceedings conducted pursuant to the courts' probate jurisdiction. *Rice v. Tilton,* 1905, 14 Wyo. 101, 82 P. 577; *Lethbridge v. Lauder,* 1904, 13 Wyo. 9, 76 P. 682. Thus, the actions taken by the probate court with regard to the Burdick estate are entitled to a presumption of correctness. As a result, we will presume the disposition of the property was correct since this is a collateral attack, so long as the district court while sitting in probate had good jurisdiction over the property in dispute. *In re Estate of Stevenson,* Wyo. 1968, 445 P.2d 753. Since a probate court's jurisdiction is limited and over only that property which comprises an estate, the question here ultimately becomes whether the claimed shares of Standard Oil of Indiana were a part of the Burdick estate.

■ In order to resolve this question, the language of the inter vivos trust must be analyzed and compared to that appearing in the will. The trust agreement provided:

"For a valuable consideration the grantor has set over, assigned, transferred and delivered to the trustee, her successors in trust and assigns, twenty four hundred (2,400) shares of capital stock of Midwest Refining Company.

"TO HAVE AND TO HOLD all and singular the said shares of stock, in trust nevertheless * * * and upon the death of the said grantor shall transfer, pay over and deliver the said shares of stock to the *trustee or trustees of the estate* of said grantor who have been or may be named and designated by said grantor in his Last Will and Testament." (Emphasis added.)

Mr. Burdick's will also used the term "joint trustees of my estate." Even the codicils used this terminology. The probate court appointed the persons who were named joint trustees of the estate as the executors, apparently having concluded that the terms were intended to be synonymous. Since the trust agreement was executed six months after the will, the conclusion follows that the term joint "trustees of the estate" as used in that agreement in all probability would have the same meaning the court determined was ascribed to it in the will. Therefore, under the trust agreement, upon Charles Burdick's death, the trust property passed to the executors and into the estate, and from there, in accord with the provisions of the will, it passed on into the testa-

---

**2.** The grant of jurisdiction over probate matters is currently found in § 2–2–101, W.S.1977 (1980 Replacement), and is virtually unchanged from W.C.S.1920, § 6673:

"The district courts of the state have exclusive original jurisdiction of all matters relating to the probate and contest of wills and testaments, the granting of letters testamentary and of administration, and the settlement and distribution of decedents' estates. The court granting the letters has exclusive jurisdiction of all matters touching the settlement and distribution of the estates for which letters have been granted."

mentary trust. Since the property would have first become a part of the estate, the conclusion then follows that it was subject to the probate court's jurisdiction.

It is clear that the probate court did attempt to exercise jurisdiction over the Standard Oil of Indiana stock. The law is such that it could only properly do so if it had construed the term joint "trustees of the estate" appearing in the trust agreement as meaning executors. Since a probate court's proceedings are entitled to the presumption of regularity, we will presume that such a finding of fact was made. This is consistent with the court's appointment of those named as joint trustees of the estate to be the executors. Further, our presumption is not impermissible bootstrapping of jurisdiction.

"* * * It is black letter law that a court of law or equity has the power to determine whether the necessary facts prerequisite to the exercise of its jurisdiction are present. * * *" *Leveto v. National Fuel Gas Distribution Corp.*, 1976, 243 Pa.Super. 510, 366 A.2d 270, 274.

Thus, the probate court had jurisdiction to make the necessary findings of fact which are clearly entitled to res adjudicata effect.

The only reason the door was not firmly closed is because the court never actually made the requisite finding on the record. However, appellants have presented no evidence refuting the presumption of regularity. Accordingly, we must agree with the district court's determination that it is too late for appellants to object to the transfer of the 6,000 shares of Standard Oil of Indiana to Margaret Hewlett.[3]

## BACKGROUND—CLAIM TO STANDARD OIL OF NEW JERSEY STOCK

Between the years 1948 and 1963, Standard Oil of Indiana declared certain dividends to its stockholders, payable in shares

3. We make no finding as to the correctness of the probate court's action in distributing the property in 1930.

4. Section 34–18–106, W.S.1977:

"(a) Corporate distributions of shares of the distributing corporation, including distri-

of stock of Standard Oil of New Jersey. Standard Oil of Indiana had acquired these shares in 1932 when it transferred certain of its foreign properties to Standard Oil of New Jersey.

When paying on the dividends, Standard Oil of Indiana had designated that the value of distribution be of dividends in kind, payable in Standard Oil of New Jersey stock. The distribution was charged against the earned surplus of Standard Oil of Indiana. The dividends were not denominated as a return of capital. In every year in which such a dividend was paid, Standard Oil of Indiana sent notices to all stockholders receiving the dividends advising them to treat the dividends as income for the taxable year in which they were received.

Standard Oil Company of Indiana had sufficient earnings and earned surplus against which such charge was made. There is no evidence of record demonstrating that the stock dividend, in kind, of Standard of New Jersey, declared to the owners of Standard Oil Company of Indiana impinged upon the capital of Standard of Indiana, or amounted to a partial liquidation of Standard of Indiana. Further, the distribution of the stock dividend in kind of Standard Oil Company of New Jersey does not appear to have been made by Standard Oil Company of Indiana pursuant to a court decree or final administrative order by a government agency ordering distribution of the particular assets.

In Margaret Hewlett's estate, 18,298 shares of Standard Oil of New Jersey were attributable to dividends taken by Margaret Hewlett as income on the trust, the corpus of which was originally the 12,000 shares of Standard Oil of Indiana.

## HOLDING—CLAIM TO STANDARD OIL OF NEW JERSEY STOCK

■ Currently, § 34–18–106, W.S.1977,[4] is

butions in the form of a stock split or stock dividend, are principal. A right to subscribe to shares or other securities issued by the distributing corporation accruing to stockholders on account of their stock ownership

the controlling statute for deciding whether the distribution of corporate stock is principal or income. As part of the Uniform Principal and Income Act (1962 version), the statute was passed in 1963. Therefore, it is not controlling unless it can be applied retroactively to the transactions occurring in this case between 1948 and 1963. A quick check of Wyoming case law concerning the requirements for retroactive application of a statute indicates that it would be improper to apply the statute to the situation here since the legislation evinces a legislative intent that it not apply to receipts obtained before the effective date of the act.[5] *Vigil v. Tafoya,* Wyo. 1979, 600 P.2d 721; *Johnson v. Safeway Stores, Inc.,* Wyo. 1977, 568 P.2d 908. Therefore, we are constrained to try and reconstruct what the law would have been before the passage of the statute.

■ The only Wyoming case which bears on the subject is *Allith-Prouty Co. v. Wallace,* 1925, 32 Wyo. 392, 233 P. 144, reh. den. 234 P. 504. There in dictum Justice Blume hinted that Wyoming would follow the Massachusetts rule. This rule was to the effect that dividends paid in stock of the declaring corporation were principal while dividends paid in either cash or in stock of another corporation were income unless they amounted to a partial liquidation of the corporate assets. The Massachusetts rule has long since the *Allith-Prouty Co.* decision become the majority rule and been embodied in the Restatement, Trust 2nd § 236:

"Except as otherwise provided by the terms of the trust, if shares of stock of a corporation are held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary, the following rules are applicable:

"(a) Except as stated in Clauses (e) and (f), *dividends payable in cash or in property other than in shares of the declaring corporation,* including ordinary and extraordinary dividends, are income, if payable to shareholders of record on a designated date which is within the period; or,

and the proceeds of any sale of the right are principal.

"(b) Except to the extent that the corporation indicates that some part of a corporate distribution is a settlement of preferred or guaranteed dividends accrued since the trustee became a stockholder or is in lieu of an ordinary cash dividend, a corporate distribution is principal if the distribution is pursuant to:

"(i) A call of shares;

"(ii) A merger, consolidation, reorganization, or other plan by which assets of the corporation are acquired by another corporation; or

"(iii) A total or partial liquidation of the corporation, including any distribution which the corporation indicates is a distribution in total or partial liquidation or any distribution of assets, other than cash, pursuant to a court decree or final administrative order by a government agency ordering distribution of the particular assets.

"(c) Distributions made from ordinary income by a regulated investment company or by a trust qualifying and electing to be taxed under federal law as a real estate investment trust are income. All other distributions made by the company or trust, including distributions from capital gains, depreciation, or depletion, whether in the form of cash or an

option to take new stock or cash or an option to purchase additional shares, are principal.

"(d) Except as provided in subsections (a), (b), and (c), all corporate distributions are income, including cash dividends, distributions of or rights to subscribe to shares or securities or obligations of corporations other than the distributing corporation, and the proceeds of the rights or property distributions. Except as provided in subsections (b) and (c), if the distributing corporation gives a stockholder an option to receive a distribution either in cash or in its own shares, the distribution chosen is income.

"(e) The trustee may rely upon any statement of the distributing corporation as to any fact relevant under any provision of this act [§§ 34–18–101 to 34–18–116] concerning the source or character of dividends or distributions of corporate assets."

5. Section 34–18–114, W.S.1977:

"Except as specifically provided in the trust instrument or the will or in this act, [§§ 34–18–101 to 34–18–116] this act shall apply to any receipt or expense received or incurred after the effective date of this act by any trust or decedent's estate whether established before or after the effective date of this act and whether the asset involved was acquired by the trustee before or after the effective date of this act."

if no such date is designated, if declared at a date within the period.

\* \* \* \* \* \*

"(e) Upon the total or partial liquidation of the corporation during the period, amounts paid as cash dividends declared before such liquidation occurred or as arrears of preferred or guaranteed dividends are income; all other amounts paid upon corporate shares on distribution of the corporate assets to the shareholders are principal.

"(f) A distribution by a corporation which is a return of capital and not a distribution of earnings is principal."

We believe that the Restatement is consistent with *Allith-Prouty Co.* and also reflects the majority view of the country during the time in question. It is the law to be applied to the dividends paid in this case.

Turning to the facts in this case, since the dividends were distributed in stock of another corporation, the ultimate question for us to resolve is whether the payment of these dividends amounted to a partial liquidation of Standard Oil of Indiana. The district court granted a summary judgment on the issue; therefore, in order to affirm we must find insufficient evidence for partial liquidation to even raise a question of fact.

■ Standard Oil of Indiana had received the shares of Standard Oil of New Jersey along with cash in 1932 when it transferred certain foreign property to Standard Oil of New Jersey. Sixteen years later Standard Oil began paying out the shares of stock as dividends. The dividends were charged against the earned surplus of Standard Oil of Indiana. There is no evidence that the capital of the corporation was impinged upon in any way. In light of the facts adduced before the district court, we must conclude that the payment of Standard Oil of New Jersey stock as dividends by Standard Oil of Indiana did not amount to a partial liquidation; therefore, the dividends were properly treated as income.

## BACKGROUND—OIL ROYALTIES

At the time of his death, Charles Burdick was the owner of certain oil royalty interests located in Natrona County. These interests were overriding oil royalty interests arising out of federal leases. Prior to Mr. Burdick's death, oil wells had been drilled and he was receiving royalty payments. In accord with the provisions in the will, the royalty interests were placed in the testamentary trust. From the date of commencement of said trust down to the date of death of Margaret Hewlett, the total amount of royalties paid was in the sum of over six hundred thousand dollars. All of these payments were turned over to Margaret Hewlett and she treated the total amount thereof as income. No part of the payments were treated by her or accounted for by her as corpus of the trust and no reserve was set up for the benefit of the remaindermen of the trust.

## HOLDING—OIL ROYALTIES

The best statement of the law currently with respect to the rights of owners of successive legal interest in the mineral lands can be found in Scott on Trusts, Vol. III, § 239.3. There it is stated:

"\* \* \* Where the owner of such land creates a legal life estate in one person and a remainder in another, and it is not otherwise provided by the terms of the instrument by which the successive estates are created, it is held that if mines were opened prior to the creation of the estates the life tenant is entitled to continue to work the mines and to take the proceeds as his own without deduction for depletion. On the other hand, where no mines were opened prior to the creation of the estates, neither the life tenant nor the remainderman is entitled to open the mines without the consent of the other. If the life tenant does open mines, the proceeds will be treated as principal. \* \* \*" (Footnotes omitted.)

Here, the oil wells were producing before Mr. Burdick's death.

"\* \* \* The classification of \* \* \* royalty as income or principal turns on the question whether the \* \* \* well from which the same is derived was an open well in fact or in contemplation of law at the

time of the death of the owner of the preceding estate. If a mine or well is open when the life tenant comes into possession, he may work such mine or well to exhaustion unless precluded by the instrument creating the life estate. The income from such well goes to the life tenant and not the remainderman. * * * " *Mairs v. Central Trust Co.*, 1945, 127 W.Va. 795, 34 S.E.2d 742.

Elsewhere it has been stated:

"By the later common law, life estates, whether conventional or arising by operation of law, were impeachable for waste, unless the instrument creating a conventional life estate expressed a contrary intention. Under this rule, a life tenant was not permitted to open new mines. * * *

"It has, however, long been the law that where mines were opened or the leases executed before · the life estate commenced, the owner of the life estate might, in the absence of restraining words, work the mines, even to the point of exhaustion, and take the profits. * * * " *Poole v. Union Trust Co.*, 1916, 191 Mich. 162, 157 N.W. 430.

It has also been held:

" 'When property is granted, all that is necessary to the enjoyment of the grant is impliedly granted as incident to the express grant, and the same rule of construction applies to an exception in a grant.' * * * It is settled law that tenants for life or years are entitled to work mines, quarries, clay pits, or gravel beds which had been opened and used before the time of the commencement of the particular estate. * * * This rule is founded upon the principle that the holder is entitled to use and enjoy the land according to the previous and accustomed method. The opening of new mines would be waste, but the working of the old ones is a simple continuation of the use of the land made by the owner. * * * " *Waldorf v. Elkhart & W. R. Co.*, 1895, 13 Ind.App. 134, 41 N.E. 396.

The purpose of the so-called "open mine" rule is to try and match testator's intent. Presumably where she/he has been receiving oil royalty payments she/he considers them to be income. Thus, absent some words of limitation in instrument creating a trust, it is assumed that testator intended the life tenant to enjoy the property in the same fashion and to the same extent it had been enjoyed by the testator. *Spangler v. Carlisle*, 1976, 70 Mich.App. 288, 245 N.W.2d 720; *In re Bruner's Will*, 1950, 363 Pa. 552, 70 A.2d 222.

■ In the present case, no words of restriction appear in the will creating the testamentary trust. Thus, Margaret Hewlett was entitled to enjoy the royalty interests in the same manner that they had been enjoyed by her father. As a result she was able to take the royalty payments and treat them as income.

The Uniform Principal and Income Act does not dictate a different result. As stated in § 34–18–109(b), W.S.1977:

"(b) If a trustee, on the effective date of this act, held an item of depletable property of a type specified in this section he shall allocate receipts from the property in the manner used before the effective date of this act, but as to all depletable property acquired after the effective date of this act by an existing or new trust, the method of allocation provided herein shall be used."

Thus, by its own terms, this trust was exempted from coverage since the corpus was acquired nearly forty years before the act.

Affirmed.

McCLINTOCK, Justice, dissenting in part.

I agree that the "open-mine" principle should be applied if the mineral rights were producing royalties at the time the trust was created. I also agree that the "Massachusetts rule," espoused by this court in *Allith-Prouty Co. v. Wallace*, 32 Wyo. 392, 233 P. 144, 39 A.L.R. 513 (1925), *reh. denied* 234 P. 504, and essentially stated in Restatement of Trusts, Second, § 236, that dividends "in property other than in shares of the holding corporation," should govern the treatment to be given the distribution of shares in New Jersey Standard by Indiana Standard.

However, the probate judge's ruling that the stock dividends consisting of 6,000 shares of Standard Oil Company of Indiana stock were income and should be distributed to Margaret Hewlett was contrary to the law of Wyoming. Four years prior to the probate court's ruling this court stated:

> "* * * Ordinarily a dividend declared in stock is to be deemed capital and not income. The interest of stockholders in a corporation remains unchanged upon the latter declaring a stock dividend. * * *"
>
> *Allith-Prouty Company v. Wallace,* supra, 32 Wyo. at 408 and 234 P. at 506.

As this court explained in *Allith-Prouty,* when a corporation declares a stock dividend it is merely increasing the number of shares that a stockholder owns without increasing the stockholder's interest in the corporation. By allowing Margaret Hewlett to treat the stock dividend as income, the probate judge reduced the percentage of the trust's ownership of the corporation. In other words, the principal of the trust and the contingent remaindermen's interest were substantially diminished. Therefore, the probate judge erred when he declared that the stock dividends were income of the trust and the remaindermen should be entitled to recover these shares of stock from Margaret Hewlett's estate.

The majority avoids this very logical and proper result by treating the action of the probate court of Laramie County as an error committed in the exercise of proper jurisdiction and, therefore, correctable only by timely appeal. I cannot agree either that the probate court had jurisdiction or that the action before us, instituted by the remaindermen some years after the original estate had been closed, is barred by limitations or laches.

The majority correctly cites *Church v. Quiner,* 31 Wyo. 222, 224 P. 1073 (1924) as holding the probate arm of the district court to exercise only a limited jurisdiction and that jurisdiction is to distribute and settle probate estates. Any decree outside that jurisdiction is ineffectual and void. *Matter of Estate of Frederick,* Wyo., 599 P.2d 550, 555 (1979). I also consider pertinent this statement from 1 Bancroft's Pro-

bate Practice, § 27, pp. 70–71 (2d ed. 1950), quoted with approval by us in *Matter of Estate of Blaney,* Wyo., 607 P.2d 354, 356 (1980):

> "'* * * It is thoroughly established that in probate proceedings title to property as between the estate, the heirs or devisees, and a third person may not be tried. Thus a superior court, sitting in probate, has no jurisdiction or authority to determine disputed titles to the property of the estate of a deceased person. * * *'" (Footnote omitted.)

Here the dispute existed between the estate of Charles W. Burdick and the trustee (as well as the remaindermen) of the trust created by Burdick during his lifetime. Under the principles establish in *Quiner* and recognized by the two later decisions, the probate court was without jurisdiction to determine ownership of either the 12,000 shares or the 6,000 shares, over both of which it sought to exercise jurisdiction when it decreed that the 12,000 shares should be turned over by the inter vivos trust trustee to the testamentary trust trustees, and the 6,000 shares should be turned over by the inter vivos trustee to the life beneficiary of the testamentary trust.

I cannot agree with the majority when they conclude (slip opinion at page 3) that the inter vivos trust property passed to the estate in accordance with the provisions of the will. While the 12,000 shares of Indiana were included in the inventory the probate judge did not treat them as part of the testamentary estate of Charles W. Burdick. What he did was to give effect to an instrument not before him and direct a person (the trustee of the inter vivos trust) likewise not before him to transfer part of the corpus of the trust to one entity (the testamentary trust) and another part of that corpus to another party (the life beneficiary).

By the inter vivos trust agreement the trustee was directed:

> "TO HAVE AND TO HOLD all and singular the said shares of stock, in trust nevertheless, to collect and receive the income thereof, and to apply the entire

net income to the use of the grantor during the term of his natural life, *and upon the death of the said grantor shall transfer, pay over and deliver the said shares of stock to the trustee or trustees of the estate of said grantor who have been or may be named and designated by said grantor in his Last Will and Testament.*" (Emphasis added.)

That the probate judge was not distributing the Indiana stock (either the 12,000 shares or 6,000 shares) as estate property is show in paragraph 3 of the decree of distribution:

"3. The Court further finds that under the trust agreement referred to in said final account and report, 12,000 shares of the capital stock of Standard Oil Company, an Indiana corporation, were issued to Margaret B. Hewlett, trustee, under Certificates numbered * * *, and that thereafter and on or about the 15th day of March, 1929, 6,000 shares of the capital stock of said Standard Oil Company, an Indiana corporation, were issued as a stock dividend upon said original 12,000 shares, * * * *to Margaret B. Hewlett, trustee.* The Court further finds that *under said trust agreement, and pursuant to the terms thereof,* said original 12,000 shares of the capital stock of Standard Oil Company, an Indiana corporation, should be transferred and *delivered by said trustee* to George W. Hewlett and Margaret B. Hewlett as testamentary trustees named in the will of decedent; that under the terms of decedent's will, Margaret B. Hewlett, daughter of decedent, is entitled to receive all net income from the property of said estate, during the period of her natural life, and that said 6,000 shares, issued as a stock dividend by the Standard Oil Company, an Indiana corporation, should be distributed, transferred and delivered by *Margaret B. Hewlett, trustee as aforesaid* to Margaret B. Hewlett as life beneficiary under decedent's will as a portion of the net income from said estate passing to her under the will of her father Charles W. Burdick." (Emphasis added.)

Had the probate judge considered the distribution as being from the estate, the distribution would have been directed to be from Margaret and George Hewlett as executors of the estate and not from Margaret Hewlett as trustee.

The probate judge did not include the inter vivos trust property in the estate. His order directed that this property pass from the inter vivos trust directly into the testamentary trust. This type of transfer is a mirror image of the present-day pour-over trust where upon death estate assets are transferred to an existing inter vivos trust. Here, property from an existing inter vivos trust was transferred into a testamentary trust. Because the shares in question never became part of the estate, the probate judge never had jurisdiction over the inter vivos trust proper. Therefore, the probate court's order awarding Margaret Hewlett the 6,000 shares of stock dividend as income is a nullity. *Church,* supra, 224 P. 1073.

Furthermore, the federal district court did not have jurisdiction when it ordered Standard Oil of Indiana to reissue the shares of stock in Margaret Hewlett's name as an individual. The contingent remaindermen were not made parties to that action and, therefore, like the probate court's decree the order of the federal district court is a nullity. As the court in *Mason v. Young,* 203 Ga. 121, 45 S.E.2d 643, 645 (1947), stated, quoting from 31 C.J.S., Estates, § 100:

" 'It is the general rule that the right of contingent remaindermen constitutes an estate in land of which they cannot be divested during the existence of the life estate except by appropriate legal proceedings to which they are made parties.' "

Appellees contend that appellants are barred from asserting the present claims by reason of the statute of limitations and laches. Once again, I cannot agree. Appellants did not have a right of action until the life estate was terminated. As a general rule neither the applicable statute of limitations nor laches will bar an action brought by remaindermen until the remaindermen are entitled to possession of the estate. *Shutt's Adm'r v. Shutt's Adm'r,* 192 Ky. 98, 232 S.W. 405, 409 (1921); *Metcalfe v. First*

*Nat. Bank of Pittsfield*, 312 Ill.App. 385, 39 N.E.2d 61, 63–64 (1941).

In *Shutt's Adm'r*, supra, 232 S.W. at 409, a case not unlike the one at bar, the court held that the appellant could not

"* * * defeat the recovery by the remaindermen of the money received by his decedent for the bank stock in question. As the money she received for the bank stock was a part of the corpus of the estate, neither her failure to reinvest it as directed by her husband's will nor her failure to charge herself with it in any of her various settlements had the effect to change its status. * * *"

The decedent, who held a life estate in the property devised to her by her husband's will, sold 56 shares of bank stock and failed to reinvest the money or to use the money to pay estate debts. After the termination of the life estate, the remaindermen brought an action seeking to recover these funds from the life tenant's estate. In discussing when the statute of limitations begins to run, the court stated:

"* * * There is nothing in the facts of this case that could have caused the case that could have caused the statute of limitations to begin to run before the death of the life tenant. It belongs to the class controlled by the general and well-known rule that—

" 'The life tenant's holding is not adverse to the remaindermen, but, on the contrary, is amicable to them; the possession of the life tenant being the possession of the remaindermen.'

"Therefore the statute of limitations does not begin to run until the death of the life tenant or termination of the life estate; and this is true whether the property constituting the life estate be real or personal property. [Citations.]

"There are a number of cases which hold remaindermen may sue in equity before the expiration of the life estate to quiet their title to the property as against an adverse claimant, or to be placed in a condition to make it available when the time shall arrive when they will be entitled to the possession and use of the estate. [Citations.] These cases, however, also hold that the statutes of limitation do not begin to run against remaindermen until the expiration of the life estate; which is necessarily so, because the possession of a life tenant, or of one holding under the latter, cannot, during the continuance of the life estate, be adverse to the remaindermen. The several cases cited are conclusive of the question that the statute of limitations is not a bar to the recovery by the remaindermen of the proceeds of the bank stock sold by the appellant's decedent. * * *" 232 S.W.2d at 409.

I find the theory behind this general rule particularly compelling in the case of contingent remaindermen like those in the case at bar because their interest may never become vested. Here the remaindermen's cause of action is not barred by the statute of limitations or laches.

For these reasons I would affirm the decision of the trial court upon all issues except as to dividends of Standard Oil Company of Indiana stock. As to that question, I would reverse and remand to the district court with instructions to declare the testamentary trustee the owner of all stock dividends paid in stock of Indiana Standard growing out of ownership of the original 12,000 shares, the 6,000 shares dividend and any later stock dividends based in such ownership.